**No. 24-12047-H**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

Arthur Anderson, et al.,

*Plaintiffs-Appellants*,

v.

Lockheed Martin Corporation, et al.,

*Defendants-Appellees*

Appeal from the United States District Court
for the Middle District of Florida

No. 6:21-cv-1363-RBD-DCI

---

### APPELLANTS' OPENING BRIEF

---

Josh Autry
Morgan & Morgan
333 W Vine St, Ste 1200
Lexington, KY 40507
859-899-8785
jautry@forthepeople.com

Rene F. Rocha
Morgan & Morgan
400 Poydras St, Ste 1515
New Orleans, LA 70130
954-318-0268
rrocha@forthepeople.com

Adam P. Bergeron
Morgan & Morgan
47 Maple St, Ste 104D
Burlington, VT 05401
407-974-2075
adambergeron@forthepeople.com

*Attorneys for Appellants*

**No. 24-12047**
**Arthur Anderson, et al v. LMT, et al**

CERTIFICATE OF INTERESTED PERSONS

Albanis, Panagiotis V.

Anderson, Arthur

Appel, Marie N.

Askren, Jillian M.

Autry, Josh

Bergeron, Adam P.

Brackett, Elizabeth

Brunelle, Justin

Brunelle, Meredith

Citera, Francis A.

Dalton Jr., Roy B., U.S. District Judge

Davis, Michael

DeMilt, Donna

Ebert, Andrew

Estate of Carol Davis

Flury, Katherine

Goertz, Donald

Goldrosen, Eitan

Goldschmidt, Elaine

Goldschmidt, Victor

Goodson, Logan

Havens, Brendan

Henderson, Craig

Hopper, Ryan T.

Innes, Andrew

Innes, Morgan

Irick, Daniel C., U.S. Magistrate Judge

Jackson, Raymond D.

Jarecki, Shawn K.

Juda, Laura

Juda, Mark

Kantor, Daniel

Kantor Neurology

Kemp, Brian

Kemp, Kelly

Kendall, Ronald J.

Khasin, Irina

Kiely, Kevin

Komatsu, Naho

Komatsu, Naoyuki

Kozak, Jeff

Lockheed Martin Corporation LMT

McGarry, Ann

McGarry, Michael

Miller, Gretchen N.

Moore, Joshua D.

Morgan & Morgan, P.A.

Morgan, T. Michael

Muddell, Jeffrey

Muddell, Stephanie

Outing, Marie

Panigrahy, Dipak

Petosa, Frank M.

Porter, Bryan C.

Ram, Michael F.

Ramsey, Patricia

Rocha, Rene F.

Ross, Renee

Rutledge, Eric

San Martin, Emilio

Sahu, Ranajit (Ron)

Sheen, Kristen

Slusarz, Brian

Stone, Wendy

Torres, Christopher

Tosti, Helen

Tosti, John

University City Property Management III, LLC

Weinstein, David B.

White, Brenda

White, Christopher

Winn, Jennifer N.

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request oral argument to address the abuses of discretion committed by the district court, as detailed in this brief, as well as any additional issues raised in Appellees' brief.

## TABLE OF CONTENTS

Certificate of Interested Persons ...................................................................C-1

Request for Oral Argument ............................................................................. i

Table of Contents ............................................................................................ ii

Table of Citations ........................................................................................... iii

Jurisdictional Statement ................................................................................ vi

Statement of the Issues...................................................................................1

Statement of the Case.....................................................................................2

    I.    The course of proceedings and dispositions in the court below ...................2

    II.  Statement of the facts............................................................................4

        A.   Dr. Panigrahy ............................................................................5

        B.   Drs. Cowan and Kendall...........................................................8

Statement of the Standard of Review.............................................................11

Summary of the Argument .............................................................................15

Argument.........................................................................................................16

    I.    The district court abused its discretion by failing to conduct a *Daubert* analysis...............................................................................16

    II.  The district court abused its discretion by determining a credibility issue that is reserved exclusively for the jury. ................................21

    III. The district court abused its discretion by summarily finding that Dr. Panigrahy's omission of quotation marks in part of his report affected the reliability of his opinions. ................................27

    IV. The district court abused its discretion by finding IARC conclusions insufficient to support causation without evaluating the epidemiology, animal studies, and mechanisms of action. ................................34

    V.  The district court abused its discretion when it found reliability issues that were irrelevant to Dr. Panigrahy's opinions. ................................38

    VI. The district court abused its discretion by dismissing Plaintiffs' claims without addressing their other causation experts. ................................40

Conclusion .......................................................................................................42

TABLE OF CITATIONS

CASES

*Adams v. Laboratory Corp. of America*,
    760 F.3d 1322 (11th Cir. 2014)........................................11, 12, 13, 15, 22, 26

*ADT LLC v. Safe Home Sec. Inc.*,
    2022 WL 3702839 (S.D. Fla. June 21, 2022)................................................23

*Allen v. Pennsylvania Engr. Corp.*,
    102 F.3d 194 (5th Cir. 1996)..........................................................................37

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999)....................................................... 12, 18, 24

*Cartagena v. Homeland Ins. Co. of New York*,
    2019 WL 6878243 (S.D.N.Y. Dec. 16, 2019)................................................31

*Chapman v. Procter & Gamble Distribg.*,
    766 F.3d 1296 (11th Cir. 2014)......................................................................17

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)............... 2, 11, 12, 13, 16, 17, 18, 22, 24, 25, 26, 27, 40

*GWTP Investments, L.P. v. SES Americom, Inc.*,
    2007 WL 7630459 (N.D. Tex. Aug. 3, 2007)................................................23

*Hardeman v. Monsanto Co.*,
    997 F.3d 941, (9th Cir. 2021)........................................................................38

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002)......................................................................40

*Hendrix ex rel. G.P. v. Evenflo Co.*,
    609 F.3d 1183 (11th Cir. 2010)..................................................11, 17, 18, 34

*In re Abilify (Aripiprazole) Products Liab. Litig.*,
    299 F. Supp. 3d 1291, 1322 (N.D. Fla. 2018) ..............................................40

*In re Cathode Ray Tube Antitrust Litig.*,
    2022 WL 4596621 (N.D. Cal. Aug. 1, 2022) ................................................26

iii

*In re Zantac (Ranitidine) Prod. Liab. Litig.*,
    644 F. Supp. 3d 1075 (S.D. Fla. 2022) ..........................................................19

*Kilpatrick v. Breg, Inc.*,
    613 F.3d 1329 (11th Cir. 2010)......................................................................18

*Lahoda v. Holder*,
    567 Fed. Appx. 557 (9th Cir. 2014)................................................................23

*Legier and Materne v. Great Plains Software, Inc.*,
    2005 WL 2037346 (E.D. La. Aug. 3, 2005) ...................................................23

*McClain v. Metabolife Intern., Inc.*,
    401 F.3d 1233 (11th Cir. 2005)................................................................ 22, 36

*Mims v. U.S.*,
     375 F.2d 135 (5th Cir. 1967)................................................................... 15, 22

*Moore v. BASF Corp.*,
    2012 WL 6002831 (E.D. La. Nov. 30, 2012) ................................................25

*Moore v. GEICO Gen. Ins. Co.*,
    633 Fed. Appx. 924 (11th Cir. 2016)...................................................... 21, 41

*Moore v. Intl. Paint, L.L.C.*,
    547 Fed. Appx. 513 (5th Cir. 2013)................................................................26

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003)............................................................... 12, 40

*Rappuhn v Primal Vantage Company*,
    2024 WL 2930448 (11th Cir. June 11, 2024) ............................ 12, 15, 16, 22

*Rink v. Cheminova*,
    400 F.3d 1286 (11th Cir. 2005)........................................................ 12, 22, 23

*Seamon v. Remington Arms Co.*,
    813 F.3d 983 (11th Cir. 2016).........................................................11, 12, 13

iv

*Siharath v. Sandoz Pharm. Corp.*,
 131 F. Supp. 2d 1347 (N.D. Ga. 2001)............................................................18

*Sorrels v. NCL (Bahamas) Ltd.*,
 796 F.3d 1275 (11th Cir. 2015).............................................................. 13, 26

*Spiral Direct v. Basic Sports Apparel*,
 2017 WL 11457208 (M.D. Fla. Apr. 13, 2017) .......................... 24, 25, 26, 32

*Tawuo v. Lynch*,
 799 F.3d 725 (7th Cir. 2015)............................................................................23

*U.S. v. Feliciano*,
 761 F.3d 1202 (11th Cir. 2014).................................................... 13, 15, 22, 24

*United Fire & Cas. Co. v. Whirlpool Corp.*,
 704 F.3d 1338 (11th Cir. 2013).............................................................. 14, 16

*United States v. Alabama Power Co.*,
 730 F.3d 1278, 1282 (11th Cir. 2013)............................................................12

*Williams v. Mosaic Fertilizer, LLC*,
 *889 F.3d 1246 (11th Cir. 2018)* ....................................................................36

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction over this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).[1] This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, based on Plaintiff's appeal from the district court's final judgment entered under Fed. R. Civ. P. 54(b).[2] This appeal is timely under Fed. R. App. P. 4(1)(A) because it was noticed on June 21, 2024,[3] within 30 days after the district court entered the judgment on May 31, 2024.[4]

---

[1] *See* Doc. 80 (denying Plaintiffs' motion to remand to state court after Lockheed removed the case to federal court).

[2] *See* Doc. 422 p. 2 (order certifying judgment); Doc. 424 (judgment).

[3] Doc. 432.

[4] Doc. 424.

## STATEMENT OF THE ISSUES

1.    The district court abused its discretion by failing to conduct a *Daubert* analysis of Dr. Panigrahy's methodology and of the evidence underpinning his general causation opinions. (Argument Section I)

2.    The district court abused its discretion by determining a credibility issue that is reserved exclusively for the jury. (Argument Section II)

3.    The district court abused its discretion by summarily finding that Dr. Panigrahy's omission of quotation marks in part of his report affected the reliability of his opinions. (Argument Section III)

4.    The district court abused its discretion by finding IARC conclusions insufficient to support causation without evaluating the epidemiology, animal studies, and mechanisms of action cited and discussed extensively in Dr. Panigrahy's report. (Argument Section IV)

5.    The district court abused its discretion when it found reliability issues that were irrelevant to Dr. Panigrahy's opinions. (Argument Section V)

6.    The district court abused its discretion by dismissing Plaintiffs' claims without addressing their other causation experts. (Argument Section VI)

## STATEMENT OF THE CASE

The case below in the Middle District of Florida involves more than sixty plaintiffs who allege that they suffered adverse health effects as a result of exposure to toxic chemicals emitted from Defendant Lockheed Martin's weapons manufacturing facility in Orlando.[5] The Plaintiffs in this appeal suffer from cancer while other plaintiffs in this case suffer from reproductive and birth defects, and neurological and immunological injuries.[6] Plaintiffs' claims are supported by the general causation opinions of Dr. Dipak Panigrahy, a cancer researcher, Dr. Ronald Kendall, a toxicologist, and Dr. Charles Cowan, a statistician. To support specific causation, Plaintiffs in this appeal have disclosed Dr. Ranajit Sahu, an environmental engineer, Dr. Judy Schmidt, a medical oncologist, and Dr. Panigrahy.

## I. The course of proceedings and dispositions in the court below

At the outset of this case, the district court bifurcated general and specific causation for purposes of expert discovery, *Daubert* motions and summary judgment motions.[7] The district court also created bellwether groups, but only Bellwether

---

[5] Doc. 399 p. 1.
[6] Doc. 89 ¶¶ 196-267; Doc. 399 p. 1.
[7] Doc. 81 p. 4-8.

Group 1 completed the specific causation phase of the scheduling order while Bellwether Groups 2 and 3 were stayed prior to their specific causation deadlines.[8]

Prior to its decision that is now on appeal (Doc. 399), the district court entered an order addressing general causation issues (Doc. 370). In that order, the court determined that it should not have bifurcated general and specific causation because "the Court is left with an incomplete record from which to determine general causation."[9] So, the court explained that it would, in a subsequent order, "conduct the full general and specific causation inquiries together with the full scientific record before it, as it should have from the beginning."[10]

In the subsequent order (Doc. 399), now the subject of this appeal, the district court indicated that it was "tak[ing] general and specific causation up on the full scientific record."[11] In that order, the district court addressed only Dr. Panigrahy and none of the other experts offered by Plaintiffs. The district court found that:

> Dr. Panigrahy reviewed epidemiological literature and conducted a Bradford Hill analysis to conclude that seven substances are able to cause eight types of cancer affecting twenty-two Plaintiffs. … He also reviewed public health agency findings,

---

[8] Doc. 202 p. 4-6 (establishing specific causation deadlines for Bellwether Groups 2 and 3); Doc. 364 p. 3 (staying Bellwether Groups 2 and 3 before specific causation deadlines passed). The court has since entered a new scheduling order for the remaining plaintiffs who have not been dismissed. *See* Doc. 420.

[9] Doc. 370 p. 21.

[10] Doc. 370 p. 21.

[11] Doc. 399 p. 2.

animal studies, and biologically plausible mechanisms of action, which are all secondary to his epidemiological review."[12]

Despite the epidemiology, animal studies and mechanisms of action offered by Dr. Panigrahy, the district court reviewed none of it. Instead, the district court excluded Dr. Panigrahy on the basis of a credibility issue after finding that certain sections of his report "quote[d] other work verbatim without any quotation marks at all."[13] According to the district court, this constituted plagiarism even though Dr. Panigrahy cited all of his sources. The district court concluded that "the plagiarism in itself is sufficient reason for exclusion" of Dr. Panigrahy's general causation opinions.[14] Based on its exclusion of Dr. Panigrahy's general causation opinions, the district court entered summary judgment against the Plaintiffs in this appeal.[15]

## II.    Statement of the facts

Plaintiffs in this appeal lived or worked near Lockheed's chemical emissions sources for many years and allege that those chemical emissions caused their cancers.[16] Twenty-two Plaintiffs have been diagnosed with eight different types of cancer.[17] They rely on expert witnesses to show that Lockheed's chemical emissions are capable of causing their cancer types (general causation) and that Lockheed's

---

[12] Doc. 399 p. 4-5 (citations omitted).
[13] Doc. 399 p. 6.
[14] Doc. 399 p. 8.
[15] Doc. 399 p. 11-12.
[16] Doc. 89 ¶¶ 196-267.
[17] Doc. 399 p. 4 fn. 5.

chemical emissions did in fact cause their cancer (specific causation). The general causation experts relevant to the Plaintiffs in this appeal are Drs. Panigrahy, Cowan and Kendall.

### A.  Dr. Panigrahy

Focal to this appeal is Dr. Panigrahy who is an Assistant Professor at the Beth Israel Deaconess Medical Center and Harvard Medical School where he oversees a laboratory that conducts over 50 cancer studies each year and that has won numerous awards for studies of carcinogens.[18] Based on Dr. Panigrahy's research accomplishments, the National Institutes of Health and the National Cancer Institute have awarded multiple substantial multi-million-dollar grants to study cancer.[19] Dr. Panigrahy's qualifications were not challenged below.

In the general causation phase of discovery, Plaintiffs produced a report from Dr. Panigrahy in which he reviewed the relevant literature and then performed a Bradford Hill analysis to determine that seven chemicals (trichloroethylene, formaldehyde, arsenic, hexavalent chromium, tetrachloroethylene, 1,1,1-trichloroethane, and styrene) are capable of causing ten types of cancer (kidney, breast, blood, thyroid, pancreatic, liver and bile duct, lung, testicular, anal, and brain).[20] As the district court found, Dr. Panigrahy's report "is roughly broken in two,

---

[18] Doc. 136-1 p. 4.
[19] Doc. 136-1 p. 3.
[20] Doc. 136-1 p. 363-451.

with the first half examining each substance's cancer-causing properties as a general matter and the second half performing the Bradford Hill analysis on each type of cancer."[21]

The decision on appeal focused on the first half of Dr. Panigrahy's general causation report where he reviewed the relevant literature "as a general matter." In this part of Dr. Panigrahy's report, the district court found that Dr. Panigrahy "quote[d] other work verbatim without any quotation marks at all."[22] At his deposition, Dr. Panigrahy acknowledged that he copied language from a monograph published by the International Agency for Research on Cancer (IARC), and from study abstracts, without using quotation marks,[23] but he explained that "I cited the original documents … and then these are just statements of facts of a particular study. … in each of these, I cite the original reference … and then that's the fact of the study."[24]

Despite omitting quotation marks in parts of his report, Dr. Panigrahy did cite all of his sources. For example, the district court relied on a "side-by-side comparison [that] speaks for itself" citing a highlighted excerpt of Dr. Panigrahy's

---

[21] Doc. 399 p. 5.

[22] Doc. 399 p. 6.

[23] Doc. 136-3 p. 49 (Tr. at 191:4-5) ("Q. "…there are no quotation marks, right?" A. "Right. And I have the original references, so …"); *id*. at 69 (Tr. at 272:23-25 ("I did take from the [study] abstract and the IARC monograph because that stated the essence of the facts").

[24] Doc. 136-3 p. 49 (Tr. at 193:3-15).

report (Doc. 136-6) and a highlighted excerpt of an IARC monograph (Doc. 136-7).[25] Turning to those exhibits, the first highlighted paragraph in Dr. Panigrahy's report cited both the IARC monograph via footnote 184 and the study being discussed in the monograph via footnote 680.[26] So, while it is true that Dr. Panigrahy copied the language from the monograph as a way to describe the study, he cited both the source of the language and the study itself.

In other parts of the report, including in the Bradford Hill section analyzing individual cancer types, Dr. Panigrahy conducted his own causation assessment.

> When I get into my own assessment of whether the chemical can cause cancer, that's at the end of each section for each chemical; and then in the Bradford Hill analysis is where I will do the analysis for each tumor type, can these chemicals cause cancer. ... So my own analysis is in the Bradford Hill section, and at the end of each section for the chemical cancers, and then I do my own -- in the rebuttal report, I do my own analysis for the epidemiology studies, and it's summarized in a chart form at the end of each section of each chemical in the rebuttal report.[27]

However, the district court did not address the sections of Dr. Panigrahy's report where he conducted his own causation analysis. Instead, the court found it "overwhelming to try to make heads or tails of just what is Dr. Panigrahy's own

---

[25] Doc. 399 p. 6.
[26] Doc. 136-6 p. 3.
[27] Doc. 136-3 p. 68 (Tr. at 266:10-267:3). *See also* Doc. 136-4 p. 624-719 (copy of Dr. Panigrahy's report that was annotated and highlighted by Defendant to show allegations of plagiarism, but showing none in the Bradford Hill "Cancer Type" analyses).

work."[28] The court made this finding despite that it cited Defendant's exhibits which clearly differentiate between Dr. Panigrahy's own assessments and the summaries of information from other sources.[29]

### B. Drs. Cowan and Kendall

Although the district court did not address Drs. Cowan and Kendall, it should have, because they too offered general causation opinions.

Dr. Charles Cowan holds a Ph.D. in Mathematical Statistics and has served as a Professor of Statistics at University of Alabama.[30] He has held positions with the federal government as Chief Statistician at the Federal Deposit Insurance Corporation and at the U.S. Department of Education.[31] He has published numerous books and articles on survey, census and statistical methods.[32]

In Dr. Cowan's report, he examined whether, during the period 1999-2020, death and disease rates were higher in the zip code where Lockheed's facility is located as compared to background rates in the rest of Orange County, Florida.[33] Using population data from the Bureau of the Census and death certificate data from

---

[28] Doc. 399 p. 7.

[29] Doc. 399 p. 7 (citing Doc. 136-4 in which Defendant highlighted and annotated Dr. Panigrahy's report).

[30] Doc. 298-2 p. 21.

[31] Doc. 298-2 p. 21.

[32] Doc. 298-2 p. 22-5.

[33] Doc. 298-2 p. 3, 5-6; Doc. 298-3 p. 5.

the state of Florida,[34] Dr. Cowan calculated the rate of death for 27 causes of death in each of 43 zip codes.[35] The results showed that the community immediately surrounding Lockheed's facility had statistically significant higher rates of deaths from Cancer, Central Nervous System Diseases, and multiple other conditions when compared to the overall background rates of Orange County.[36] Dr. Cowan further demonstrated that these statistically significant increases in death rates held constant after adjustment for age and other potential confounders.[37]

Dr. Ronald Kendall is a Professor of Environmental Toxicology, Director Emeritus of the Institute of Environmental and Human Health, and Chairman of the Department of Environmental Toxicology at Texas Tech University.[38] Dr. Kendall is a member of the global Society of Environmental Toxicology and Chemistry (SETAC) and in 2021 was awarded its highest award, the Founders Award.[39] He has served as editor of the scientific journal Environmental Toxicology and Chemistry for over 30 years and has published many books and peer-reviewed scientific

---

[34] Doc. 298-2 p. 9-11.
[35] Doc. 298-2 p. 7.
[36] Doc. 298-2 p. 15-17.
[37] 298-3 p. 9-18.
[38] Doc. 150-1 p. 2.
[39] Doc. 150-1 p. 2-3.

publications on the effects of toxic substances.[40] He has served on several Scientific

Advisory Panels including the U.S. EPA Clean Air Scientific Advisory Committee.[41]

Dr. Kendall reviewed Dr. Panigrahy's report and the studies cited therein, and

he came to same conclusion as Dr. Panigrahy regarding general causation, but from

the standpoint of a toxicologist.[42] Dr. Kendall also relied upon the statistical analysis

of Dr. Cowan to evaluate the risks of death and disease in the zip code surrounding

Lockheed's facility (32819) as compared to the background risk of death and disease

in the remainder of Orange County, concluding that "there is strong toxicological

plausibility that the high levels of death and disease in Zip Code 32819, as compared

to similar zip codes, are attributable to Lockheed Martin's operations."[43]

---

[40] Doc. 150-1 p. 2.
[41] Doc. 150-1 p. 2.
[42] Doc. 150-1 p. 5.
[43] Doc. 150-1 p. 9; *see also* Doc. 298-2.

STATEMENT OF THE STANDARD OF REVIEW

The admission of expert opinion testimony is governed by Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. *Adams v. Laboratory Corp. of America*, 760 F.3d 1322, 1327-28 (11th Cir. 2014). An expert may testify in the form of an opinion when three criteria are met: (1) the expert is qualified; (2) the expert applied a reliable methodology; and (3) the expert's opinion will assist the jury. *Id.* at 328. Here, only the second prong—reliability—is at issue.

Reliability "concerns 'whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue.'" *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (quoting *Daubert*, 509 U.S. at 592–93).

In a toxic tort case, this Court has recognized that a "scientifically valid method [] for establishing general causation" is to offer an expert opinion "supported by epidemiological studies, provided the expert explains how the findings of those studies may be reliably connected to the facts of the particular case." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1196-97 (11th Cir. 2010); *see also id*. at 1198 n.11 (recognizing that an expert may rely "exclusively on medical literature to establish general causation" so long as it "provide[s] enough support").

11

This Court has "repeatedly stressed *Daubert*'s teaching that the gatekeeping function under Rule 702 'is not intended to supplant the adversary system or the role of the jury: vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking *shaky but admissible evidence*.'" *Adams*, 760 F.3d at 1334 (quoting *United States v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) and *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999)) (emphasis added by the *Adams* Court).

"Once an expert opinion has satisfied *Daubert*, a court may not exclude the opinion simply because it believes that the opinion is not—in its view—particularly strong or persuasive. The weight to be given to admissible expert testimony is a matter for the jury." *Seamon v. Remington Arms Co.*, 813 F.3d 983, 990 (11th Cir. 2016); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence").

In the same vein, the district court is not allowed to determine the credibility of an expert witness because that issue is reserved exclusively for the jury. *Rappuhn v Primal Vantage Company*, 2024 WL 2930448, at *4 (11th Cir. June 11, 2024) ("The reliability inquiry [under *Daubert*] is about the principles and methods the expert used, not whether the expert has provided credible testimony."); *Rink v. Cheminova*,

12

400 F.3d 1286, 1293 fn.7 (11th Cir. 2005) ("a district court cannot exclude an expert because it believes the expert lacks personal credibility"); *Adams*, 760 F.3d at 1335 ("credibility determination [of an expert witness] … has always been within the province of the jury"); *U.S. v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014) ("The jury has exclusive province over the credibility of witnesses…").

This Court reviews the district court's exclusion of expert testimony for abuse of discretion. *Seamon*, 813 F.3d at 987. "A district court abuses it discretion when it makes a clear error in judgment or applies an incorrect legal standard." *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1281 (11th Cir. 2015); *Adams*, 760 F.3d at 1331 ("[A]n error of law [in the context of conducting a *Daubert* review] is necessarily an abuse of discretion.").

This Court has held that a district court abuses its discretion when it fails to consider or correctly characterize the evidence supporting an expert's opinion. *See Seamon*, 813 F.3d at 991 (finding an abuse of discretion when the district court mischaracterized the expert's opinion and the evidence supporting it); *Adams*, 760 F.3d at 1328-29 (finding an abuse of discretion when the district court excluded an expert on the basis that her opinion was "an *ipse dixit* assessment," when her opinion was grounded in the available evidence); *Alabama Power*, 730 F.3d at 1284-88 (holding that the exclusion of an expert was an abuse of discretion because the district court mischaracterized the evidence supporting the expert's opinion); *United*

13

*Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341-42 (11th Cir. 2013) (reversing exclusion of expert testimony because the district court had failed to consider the evidence supporting the opinion).

When a district court's summary judgment decision rests entirely on its exclusion of expert testimony, this Court will reverse the summary judgment decision if it reverses the district court's decision to grant the motion to exclude. *Seamon*, 813 F.3d at 991.

## SUMMARY OF THE ARGUMENT

This appeal is not complicated. The district excluded Dr. Panigrahy's general causation opinions on the basis of a credibility issue, while foregoing a *Daubert* analysis of the evidence underpinning his opinions. This constitutes an abuse of discretion, not only because the district court neglected its gatekeeper duties under *Daubert*, *see Rappuhn*, 2024 WL 2930448, at *4 ("The reliability inquiry [under *Daubert*] is about the principles and methods the expert used, not whether the expert has provided credible testimony."), but also because it excluded Dr. Panigrahy by determining an issue that is reserved exclusively for the jury. *Rink*, 400 F.3d at 1293 fn.7 ("a district court cannot exclude an expert because it believes the expert lacks personal credibility"); *Adams*, 760 F.3d at 1335 ("credibility determination [of an expert witness] … has always been within the province of the jury"); *Feliciano*, 761 F.3d at 1206 ("The jury has exclusive province over the credibility of witnesses…"); *Mims v. U.S.*, 375 F.2d 135, 140 (5th Cir. 1967) ("one of the most generally accepted rules in all jurisprudence, state and federal, civil and criminal, is that the questions of the credibility and weight of expert opinion testimony are for the trier of facts").

ARGUMENT

## I.    The district court abused its discretion by failing to conduct a *Daubert* analysis.

As discussed in subsequent argument sections, the district court focused on a narrow issue involving credibility when it excluded Dr. Panigrahy; however, in so doing, the district court abused its discretion by failing to conduct a proper *Daubert* analysis of Dr. Panigrahy's methodology and the evidence supporting his opinions. *See Rappuhn v Primal Vantage Company*, 2024 WL 2930448, at *1 (11th Cir. June 11, 2024) (finding an abuse of discretion where "[t]he district court didn't perform a proper expert analysis under *Daubert*"); *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341-42 (11th Cir. 2013) (finding an abuse of discretion where the district court excluded expert testimony "on *Daubert* grounds" but failed to consider the evidence supporting the expert's opinion).

At the outset of its decision, the court described Dr. Panigrahy's methodology as follows:

> Dr. Panigrahy reviewed epidemiological literature and conducted a Bradford Hill analysis to conclude that seven substances are able to cause eight types of cancer affecting twenty-two Plaintiffs. … He also reviewed public health agency findings, animal studies, and biologically plausible mechanisms of action, which are all secondary to his epidemiological review. … Dr. Panigrahy's over-500-page report is roughly broken in two, with the first half examining each substance's

16

cancer-causing properties as a general matter and the second half performing the Bradford Hill analysis on each type of cancer.[44]

Dr. Panigrahy's reliance on epidemiological literature is a reliable methodology for establishing general causation. *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1196-97 (11th Cir. 2010) (describing "scientifically valid methods for establishing general causation" as those "that are supported by epidemiological studies"); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1198 (11th Cir. 2002) ("Epidemiology … is generally considered to be the best evidence of causation in toxic tort actions.").

Dr. Panigrahy's reliance on animal studies and mechanisms of action provide additional reliable support for his causation opinions. *See Hendrix*, 609 F.3d at 1197 (explaining that "[a]n expert's opinion will likely also survive *Daubert* if the expert describes the physiological process, derived by the scientific method, by which a particular cause leads to the development of a given disease or syndrome"); *Chapman v. Procter & Gamble Distribg.*, 766 F.3d 1296, 1308 (11th Cir. 2014)

---

[44] Doc. 399 p. 4-5 (citations omitted). *See also* Dr. Panigrahy's general causation report, Doc. 136-1 p. 14 ("[T]o answer the question of whether chemicals could cause cancer or increase the risk of cancer in humans, and what the biologically plausible mechanisms of action, if any, may be, I reviewed, analyzed and synthesized the four principal types of studies used to determine if chemicals are carcinogenic to humans: 1) animal cancer studies; 2) mechanistic studies of biological activity in animal tissue and cells; and 3) mechanistic studies of biological activity in human tissue and cells; 4) studies in human populations with unintentional exposure to carcinogens.").

(explaining that "animal studies" and "plausible explanations" are "secondary methodologies" whereas epidemiological evidence is a "primary method" for proving causation); *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1359 (N.D. Ga. 2001), aff'd sub nom. *Rider*, 295 F.3d 1194 ("this Court looks not only to the existence of epidemiology but also the other forms of causation evidence that Plaintiffs offer in totality to support their case").

Accordingly, when general causation opinions are at issue, it goes without saying that the district court must analyze the foundation of those opinions to fulfill its *Daubert* gatekeeping role. *See Hendrix*, 609 F. 3d 1999 (evaluating whether "the literature … provide[s] the necessary support for Dr. Hoffman's opinions to render those opinions admissible under *Daubert*"); *Rider*, 295 F.3d at 1198-1201 (evaluating "[t]he scientific evidence presented by plaintiffs in support of their theory of causation"); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314-15 (11th Cir. 1999) (endorsing "a thorough review of the medical evidence" and "a detailed look at the four epidemiological studies" underlying a general causation opinions); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1337 (11th Cir. 2010) (noting that "[t]he district court considered four of these items of literature both separately and in combination" when reviewing a general causation opinion).

Even the district court acknowledged the importance of examining the evidence underpinning the causation opinions in this case. In an earlier order, the

district court determined that it could not rule on the reliability of general causation opinions without having "the full scientific record before it," and the court indicated that it would "take a deeper look at the individual studies" before issuing a ruling.[45] However, in contravention of its own guidance, the district court excluded Dr. Panigrahy without considering any of the studies he cited and discussed.

The district court's approach with Dr. Panigrahy diverged not only from this Court's precedents, but also stands in contrast to the district court's order regarding another causation expert in this case, Dr. Mattison.[46] In that order, the district court held that Dr. Mattison's general causation opinions satisfied *Daubert* because he "relied on studies with statistically significant results (meaning with confidence intervals with a lower bound over 1.0), demonstrating strong associations between the substance and the illness."[47] *See also In re Zantac (Ranitidine) Prod. Liab. Litig.*, 644 F. Supp. 3d 1075, 1184 (S.D. Fla. 2022) ("By way of example, a relative risk ratio of 1.2 indicates that a group of persons (who were exposed to the agent of interest) had a 20% increased risk of developing a particular disease, when that group was compared to a group of persons who were not exposed to the agent of interest.").

Like Dr. Mattison, Dr. Panigrahy also relied on epidemiological studies with statistically significant results. For each type of cancer on which he opined, Dr.

---

[45] Doc. 370 p. 11, 21.
[46] Doc. 394.
[47] Doc. 394 p. 5-6.

Panigrahy cited and discussed the relevant studies,[48] he provided additional analyses and again pointed to the studies in his rebuttal report,[49] he prepared charts summarizing the studies and his analyses,[50] and Plaintiffs prepared and filed a chart pointing to the relevant studies as well.[51]

      In fact, in its motion to exclude Dr. Panigrahy, Defendant conceded that there is epidemiological support for every type of cancer on which Dr. Panigrahy offered opinions.[52] For example, Defendant claims that there is no epidemiological support for an association between kidney cancer and 1,1,1-TCA but concedes that there are associations with TCE, PCE, formaldehyde, arsenic, hexavalent chromium, and styrene.[53] Thus, even if Defendant is correct about the lack of an association between kidney cancer and 1,1,1-TCA,[54] the Plaintiffs who suffered kidney cancer (Helen

---

[48] Doc. 136-1 p. 363-73 (kidney cancer); *id*. at 373-79 (breast cancer); *id*. at 380-92 (blood cancers); *id*. at 392-400 (thyroid cancer); *id*. at 400-08 (pancreatic cancer); 408-20 (liver and bile duct cancer); *id*. at 420-32 (lung cancer); *id*. at 432-39 (testicular cancer); *id*. at 439-45 (anal cancer); *id*. at 445-51 (brain cancer).

[49] Doc. 136-2.

[50] Doc. 136-2 p. 61-66, 76-82, 93-111, 114-115, 129-140, 154-163.

[51] Doc. 211-2.

[52] Doc. 139 p. 24. Defendant's chart shows an association between every cancer type and at least one or more of the substances in question (except for gastrointestinal cancer which Defendant included on its chart but which is not a cancer type for which Dr. Panigrahy offered opinions).

[53] Doc. 139 p. 24.

[54] Plaintiffs disputed many of the "N" entries on Defendant's chart and pointed the court to the epidemiological support, *see* Doc. 173 p. 16-19, but the district court did not address any of this evidence.

Tosti and Andrew Ebert) should be permitted to show that their exposure to other chemicals emitted by Lockheed caused their kidney cancers.

In sum, the district court ignored nearly all of the evidence cited by Dr. Panigrahy to support his causation opinions, including all of the epidemiology which is "the best evidence of causation in toxic tort actions." *Rider*, 295 F.3d at 1198. By disregarding this evidence in its *Daubert* ruling, and then granting summary judgment without having considered the evidence, the district court committed reversible error. *See Moore v. GEICO Gen. Ins. Co.*, 633 Fed. Appx. 924, 930 (11th Cir. 2016) (holding that the district erred by disregarding expert evidence in a summary judgment ruling because the court "must consider *all evidence* in the record") (emphasis by Court).

## II.   The district court abused its discretion by determining a credibility issue that is reserved exclusively for the jury.

As already discussed, the district court's exclusion of Dr. Panigrahy was not based on a *Daubert* analysis; instead, it was based on a finding that Dr. Panigrahy had plagiarized portions of his report by "quot[ing] other work verbatim without any quotation marks at all."[55] According to the district court, the omission of quotation marks showed a "deliberate lack of candor" justifying Dr. Panigrahy's exclusion.[56] The court was clear on the basis of its ruling: "plagiarism ***in itself*** is sufficient reason

---

[55] Doc. 399 p. 6.
[56] Doc. 399 p. 6.

for exclusion here."[57] Thus, before addressing the substance of the district court's plagiarism finding, there is a threshold question of whether plagiarism in an expert report—standing alone—should ever justify excluding an expert from trial. The answer is no. Without a finding that plagiarism affects reliability under *Daubert*, it presents only a credibility issue that is reserved exclusively for the jury.

"*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury." *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005). "The reliability inquiry [under *Daubert*] is about the principles and methods the expert used, not whether the expert has provided credible testimony." *Rappuhn*, 2024 WL 2930448, at *4. In other words, "a district court cannot exclude an expert because it believes the expert lacks personal credibility." *Rink v. Cheminova*, 400 F.3d 1286, 1293 fn.7 (11th Cir. 2005).

The district court is not allowed to determine the credibility of an expert witness because that issue is reserved exclusively for the jury. *Adams v. Laboratory Corp. of Am.*, 760 F.3d 1322, 1335 (11th Cir. 2014) ("credibility determination [of an expert witness] … has always been within the province of the jury"); *U.S. v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014) ("The jury has exclusive province over the credibility of witnesses…"); *Mims v. U.S.*, 375 F.2d 135, 140 (5th Cir. 1967)

---

[57] Doc. 399 p. 8 (emphasis added); *see also* Doc. 399 p. 11 (concluding that "the rampant plagiarism in Dr. Panigrahy's report leads the Court to conclude that his general causation methodology as a whole is too unreliable to put before a jury").

("one of the most generally accepted rules in all jurisprudence, state and federal, civil and criminal, is that the questions of the credibility and weight of expert opinion testimony are for the trier of facts"). Instead of excluding an expert for credibility issues, "[v]igorous cross-examination [of the expert] ensures that these issues of general credibility are properly presented for consideration by the trier of fact." *Rink*, 400 F.3d at 1293 fn.7.

Courts that have evaluated acts of plagiarism have consistently characterized the conduct as a credibility issue. *See ADT LLC v. Safe Home Sec. Inc.*, 2022 WL 3702839, at *2 (S.D. Fla. June 21, 2022) ("the alleged plagiarism may be germane to the issue of Dr. Matolo's credibility"); *GWTP Investments, L.P. v. SES Americom, Inc.*, 2007 WL 7630459, at *5 (N.D. Tex. Aug. 3, 2007) ("alleged plagiarism may be germane to the issue of [the expert witness's] credibility"); *Legier and Materne v. Great Plains Software, Inc.*, 2005 WL 2037346, at *4 (E.D. La. Aug. 3, 2005) (concluding that a *Daubert* motion alleging plagiarism in an expert report "is directed towards … credibility which is better left to the trier of fact"); *Tawuo v. Lynch*, 799 F.3d 725, 728 (7th Cir. 2015) (holding that "apparent plagiarism in this case" evidences "lack of credibility"); *Lahoda v. Holder*, 567 Fed. Appx. 557 (9th Cir. 2014) (holding that plagiarism supports a "negative credibility finding").

The district court largely agreed, stating that plagiarism "typically bears on credibility rather than reliability."[58] However, the court erred by going a step further and creating its own exception to the rule. According to the district court, "when the plagiarism is so blatant that it represents a deliberate lack of candor, it may cause the report to be unreliable enough to justify exclusion."[59] Thus, under the district court's reasoning, most plagiarism would present a credibility issue for the jury, but if the court decides that the credibility of the witness is bad enough, then the court can take the issue away from the jury by excluding the witness. Such an exception should be rejected because it allows the district court to rule on an issue that is "exclusive[ly]" reserved for the jury, *Feliciano*, 761 at 1206, and the district court's gatekeeper role under *Daubert* "is not intended to supplant … the role of the jury.'" *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir.1999).

In the absence of an Eleventh Circuit case supporting the district court's exception to the rule, the court cited two unpublished district court cases, *Spiral Direct* and *Moore*. But those cases actually highlight the district court's error. In both cases, the courts ***first*** engaged in a *Daubert* analysis of the expert opinions and held that the opinions were inadmissible under *Daubert*; it was only ***after*** excluding the opinions under *Daubert* that the courts said evidence of plagiarism added additional

---

[58] Doc. 399 p. 6.
[59] Doc. 399 p. 6.

support for exclusion. *See Spiral Direct v. Basic Sports Apparel*, 2017 WL 11457208, at *1-3 (M.D. Fla. Apr. 13, 2017); *Moore v. BASF Corp.*, 2012 WL 6002831, at *1-8 (E.D. La. Nov. 30, 2012). Neither court held that plagiarism—standing alone—justified exclusion.

More specifically, *Spiral Direct* involved two categories of opinions regarding trademarks. With regard to the first opinions, the court held that they "do not assist the trier of fact and must be excluded." 2017 WL 11457208, at *1. As to the second opinions, the court held that they "must be excluded based on Kasper's lack of reliable methodology." *Id*. at *2. Only ***after*** making these findings did the court state that "[a]dditionally, her plagiarism … undermines her credibility and further supports that her opinions should be excluded from trial." *Id.* at *3. Moreover, *Spiral Direct* was not a jury case; the court was "the fact finder in this case," 2017 WL 11457208, at *1, meaning that the court would have been making the credibility determination at trial anyway, not a jury.

In *Moore*, the court engaged in a lengthy *Daubert* analysis and found that "Dr. Kura's calculations of the benzene levels in defendant's products are unreliable under the standards set forth in *Daubert*." 2012 WL 6002831, at *5. Only ***after*** excluding the opinions under *Daubert* did the court address the plagiarism evidence as "another reason" why the opinions should be excluded. *Id*. at *7. Moreover, the Fifth Circuit affirmed based solely on the lower court's *Daubert* analysis and without

25

mentioning plagiarism, demonstrating that plagiarism was not the basis for exclusion. *See Moore v. Intl. Paint, L.L.C.*, 547 Fed. Appx. 513, 515-17 (5th Cir. 2013).

In contrast to *Spiral Direct* and *Moore*, here the district court did not conduct a *Daubert* analysis of Dr. Panigrahy's expert opinions and evidence; instead the court found "the plagiarism in itself is sufficient reason for exclusion here."[60] This is not a proper exercise of the court's gatekeeper responsibility. *See In re Cathode Ray Tube Antitrust Litig.*, 2022 WL 4596621, at *2 (N.D. Cal. Aug. 1, 2022) (denying motion to exclude where the movant alleged plagiarism against an expert but "relies on neither *Daubert* nor Rule 702 it its effort to exclude Dr. Johnson's report" and holding that the movant "is free to raise the similarity between Leitzinger's and Johnson's reports to cast doubt on Johnson's credibility before the jury, but those arguments go to the weight and not the admissibility of the testimony").

The district court's focus on a credibility issue while foregoing a proper *Daubert* analysis of Dr. Panigrahy's opinions and evidence constitutes an abuse of discretion. *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1281 (11th Cir. 2015) ("A district court abuses it discretion when it makes a clear error in judgment or applies an incorrect legal standard."); *Adams*, 760 F.3d at 1331 (holding that "an error of law is necessarily an abuse of discretion" in the context of a *Daubert* review).

---

[60] Doc. 399 p. 8.

III.   **The district court abused its discretion by summarily finding that Dr. Panigrahy's omission of quotation marks in part of his report affected the reliability of his opinions.**

Instead of conducting a *Daubert* analysis of the evidence underpinning Dr. Panigrahy's causation opinions, the district court made only conclusory statements about plagiarism affecting reliability without actually evaluating how so. For example, the court said that plagiarism in Dr. Panigrahy's report was "blatant" and "ubiquitous"[61] but when it came to analyzing the effect of plagiarism, the court simply said that "it speaks for itself."[62] If the district court had evaluated the question of ***how*** the evidence of plagiarism affected reliability under *Daubert*, the court would have concluded that it does not.

As the district court explained, Dr. Panigrahy's report "is roughly broken in two, with the first half examining each substance's cancer-causing properties as a general matter and the second half performing the Bradford Hill analysis on each type of cancer."[63] Defendant's allegations of plagiarism were confined to the first part of the report; there were no allegations of plagiarism in connection with Dr. Panigrahy's Bradford Hill analysis on each type of cancer.[64]

---

[61] Doc. 399 p. 6-7.
[62] Doc. 399 p. 6.
[63] Doc. 399 p. 5.
[64] Doc. 136-4 p. 624-719 (Defendant's annotated and highlighted report showing no allegations of plagiarism in the Bradford Hill "Cancer Type" analyses).

27

The district court's finding of plagiarism relied on exhibits prepared by Defendant showing similarities between the language in the first part of Dr. Panigrahy's report with IARC monographs and study abstracts.[65] For example, the "side-by-side comparison" of Doc. 136-6 with Doc. 136-7 that the district court said "speaks for itself"[66] shows the following:

| Doc. 136-6 p. 3-4 (Dr. Panigrahy's report) | Doc. 136-7 p. 38 (IARC Monograph Vol. 106) |
|---|---|
| Groups of 50 male and 50 female B6C3F1 mice (age 5-7 weeks) were given TCE(purity, 99%) by gavage in corn oil on 5 days per week for 78 weeks[680]. Groups of 20 male and 20 female mice were given vehicle only and served as controls. Dosage adjustments were made during the exposure period: male mice were given TCE at a dose of 450 or 900 mg/kg body weight (bw) for 11 weeks, and then at 550 or 1100 mg/kg bw for 67 weeks; female mice were given TCE at a dose of 300 or 600 mg/kg bw for 11 weeks, and then at 400 or 800 mg/kg bw for 67 weeks. Time-weighted average doses of PCE were 536 and 1072 mg/kg bw per day, respectively, for males, and 386 and 772 mg/kg bw per day, respectively, for females. The treatment period was followed by a 12-week observation period. Mortality was significantly increased in treated mice compared with controls. Significant dose-related positive trends and increased incidences of hepatocellular carcinoma in all treatment groups were observed in males and females. In male mice, the incidences were 2 out of 20 (vehicle controls), 32 out of 49 (lower dose), and 27 out of 48 (higher dose); the corresponding incidences in females were 0 out of 20, 19 out of 48, and 19 out of 48. Exposure to TCE caused toxic nephropathy (characterized in this study as degenerative changes in the proximal convoluted tubules at the junction of the cortex and medulla, with cloudy swelling, fatty degeneration, and necrosis of the tubular epithelium) in male mice (0/20, 40/49, 45/48) and female mice (0/20, 46/48, 48/48). However, the 78-week exposure period reduced the power of this study to detect the full carcinogenic potential of TCE[184]. | *3.1.1 Oral administration*<br><br>Groups of 50 male and 50 female B6C3F, mice (age 5–7 weeks) were given tetrachloroethylene (purity, 99%) by gavage in corn oil on 5 days per week for 78 weeks (NCI, 1977; Weisburger, 1977). Groups of 20 male and 20 female mice were given vehicle only and served as controls. Dosage adjustments were made during the exposure period: male mice were given tetrachloroethylene at a dose of 450 or 900 mg/kg body weight (bw) for 11 weeks, and then at 550 or 1100 mg/kg bw for 67 weeks; female mice were given tetrachloroethylene at a dose of 300 or 600 mg/kg bw for 11 weeks, and then at 400 or 800 mg/kg bw for 67 weeks. Time-weighted average doses of tetrachloroethylene were 536 and 1072 mg/kg bw per day, respectively, for males, and 386 and 772 mg/kg bw per day, respectively, for females. The treatment period was followed by a 12-week observation period. Mortality was significantly increased in treated mice compared with controls. Significant dose-related positive trends and increased incidences of hepatocellular carcinoma in all treatment groups were observed in males and females. In male mice, the incidences were 2 out of 20 (vehicle controls), 32 out of 49 (lower dose), and 27 out of 48 (higher dose); the corresponding incidences in females were 0 out of 20, 19 out of 48, and 19 out of 48. Exposure to tetrachloroethylene caused toxic nephropathy (characterized in this study as degenerative changes in the proximal convoluted tubules at the junction of the cortex and medulla, with cloudy swelling, fatty degeneration, and necrosis of the tubular epithelium) in male mice (0/20, 40/49, 45/48) and female mice (0/20, 46/48, 48/48). A rare renal tubular cell carcinoma was observed in a male at the lower dose. [The Working Group noted that the study animals were housed in the same rooms as animals exposed to volatile agents, the group size for vehicle controls was small, and decreased survival and the 78-week exposure period reduced the power of this study to detect the full carcinogenic potential of the test agent.] |

[65] Doc. 399 p. 6.
[66] Doc. 399 p. 6.

28

In the above example, Dr. Panigrahy did copy language from the IARC monograph; however, he accurately cited the IARC monograph via endnote 184, and he also cited the Weisburger study (which was referenced in the IARC monograph) via endnote 680.[67] Continuing with the same exhibit (Doc. 136-6 at page 4), there are almost two pages with no highlighting, and then part of a paragraph is highlighted where Dr. Panigrahy again used language from the IARC monograph and again cited to the monograph via endnote 184.[68] On the next page (Doc. 136-6 at page 7), Dr. Panigrahy used language from the Blair (1979) study abstract (Doc. 136-10) and provided a full citation to the study via endnote 692.[69]

At his deposition, Dr. Panigrahy acknowledged that in parts of his report he did copy language from the IARC monograph and study abstracts without using quotation marks.[70] But he explained that "I cited the original documents … and then

---

[67] *See* Doc. 136-1 p. 466 n. 184 (citing "Monograph, I. TRICHLOROETHYLENE, TETRACHLOROETHYLENE, AND SOME OTHER CHLORINATED AGENTS. IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS Volume 106 (2014)"); *id*. at p. 499 n. 680 (citing "Weisburger, E. K. Carcinogenicity studies on halogenated hydrocarbons. Environ Health Perspect 21, 7-16, doi:10.1289/ehp.77217 (1977)").

[68] *Compare* Doc. 136-6 p. 5-6 *with* Doc. 136-7 p. 27.

[69] *See* Doc. 136-1 p. 499 n. 692 (citing "Blair, A., Decoufle, P. & Grauman, D. Causes of death among laundry and dry cleaning workers. Am J Public Health 69, 508-511, doi:10.2105/ajph.69.5.508 (1979)").

[70] Doc. 136-3 p. 49 (Tr. at 191:4-5) ("Q. "…there are no quotation marks, right?" A. "Right. And I have the original references, so …"); *id*. at 69 (Tr. at 272:23-25 ("I did take from the [study] abstract and the IARC monograph because that stated the essence of the facts").

these are just statements of facts of a particular study. … in each of these, I cite the

original reference … and then that's the fact of the study."[71] For example, with regard

to Blair 1979, Dr. Panigrahy acknowledged that he copied some text from the study

abstract and reproduced it in his report because "the abstract is the summary of the

paper."[72] However, more importantly, he provided a full citation to Blair 1979 via

endnote 692.[73]

As Defendant's counsel continued to ask the same question about similarities

in certain sections of Dr. Panigrahy's report and the cited sources, Dr. Panigrahy

continued to provide the same response:

> …the point is this section of the report, I cited the IARC monographs
> and I cited the original papers, so [these sections of the report are] ...
> stating the results of the epidemiology studies. And in the context, the
> important part is: What are the confidence intervals, the relative risk?
> What are the limitations? How much follow-up is there? What's the
> number, the sample size? So that part of the report that you're talking
> about, 240 to 252, I'm just stating the results of the studies, which I
> cited the IARC monograph and the original [study] citations.[74]

Dr. Panigrahy then explained where his own analysis appeared in the report:

> When I get into my own assessment of whether the chemical can cause
> cancer, that's at the end of each section for each chemical; and then in
> the Bradford Hill analysis is where I will do the analysis for each tumor

---

[71] Doc. 136-3 p. 49 (Tr. at 193:3-15).

[72] Doc. 136-3 p. 54 (Tr. at 212:2-7).

[73] Doc. 136-1 p. 241 (reproducing the Blair study abstract to summarize the findings with a reference to endnote 692); *id*. at 499, note 692 ("Blair, A., Decoufle, P. & Grauman, D. Causes of death among laundry and dry cleaning workers. *Am J Public Health* 69, 508-511, doi:10.2105/ajph.69.5.508 (1979)").

[74] Doc. 136-3 p. 67-8 (Tr. at 265:24-266:9).

type, can these chemicals cause cancer. ... So my own analysis is in the Bradford Hill section, and at the end of each section for the chemical cancers, and then I do my own -- in the rebuttal report, I do my own analysis for the epidemiology studies, and it's summarized in a chart form at the end of each section of each chemical in the rebuttal report.[75]

Despite these explanations, the district court found it "frankly overwhelming to try to make heads or tails of just what is Dr. Panigrahy's own work."[76] Yet this finding makes little sense given that the district court cited the above deposition testimony explaining where to find Dr. Panigrahy's original work,[77] and cited Defendant's exhibits highlighting the instances where Dr. Panigrahy copied language from cited sources.[78] In other words, all the district court had to do was read the deposition testimony it cited and look at the exhibits it cited and it could have readily determined what parts of the report constituted Dr. Panigrahy's original work.

The district court was also quick to characterize Dr. Panigrahy's conduct as "plagiarism" without ever evaluating the meaning of that term. However, because Dr. Panigrahy did cite his sources, the copying of language from those sources does not fit within the ordinary meaning of the term. *See Cartagena v. Homeland Ins. Co. of New York*, 2019 WL 6878243, at *6 (S.D.N.Y. Dec. 16, 2019) ("Ordinary people

---

[75] Doc. 136-3 p. 68 (Tr. at 266:10-267:3).
[76] Doc. 399 p. 7.
[77] Doc. 399 p. 7 (citing Doc. 136-3 pp. 265:18-272:9)
[78] Doc. 399 p. 6 (citing Doc. 136-4, 136-6 and 136-7).

31

understand plagiarism to mean the use of another's work without proper accreditation."); *Spiral Direct*, 2017 WL 11457208, at *2 (finding plagiarism where the expert "did not provide any citation or attribution to Nelson as the source of large sections of her report").

There is no question that the mere notion of plagiarism is offensive—so much so that it can elicit a knee-jerk reaction for sanctions. As one legal commentator observed, "courts never explain why, exactly, plagiarism is worthy of sanction. Rather, the courts proceed as though plagiarism is a *malum se* offense, a practice of such obvious moral turpitude that its prohibition requires no further explanation." Andrew M. Carter, *The Case for Plagiarism*, 9 UC Irvine L. Rev. 531, 533–34 (2019). "In other words, … plagiarism warrant[s] a sanction because, well, it [i]s plagiarism." *Id*. at 533.

But this knee-jerk reaction is misplaced because plagiarism occurs all the time and, depending on the context, no one bats an eye. For example, consider "brief banks" at law firms. *Id*. at 537 ("The brief banks exist, of course, because plagiarizing from earlier work saves the firm and its clients' time and money."). Or a well-drafted contract provision. *Id*. at 535 ("If an attorney likes the wording of a warranty clause in a contract drafted by an unaffiliated attorney, it is no sin to copy that clause verbatim into a new document without giving the original drafter attribution."). Ironically, the district court's decision excluding Dr. Panigrahy copied

entire paragraphs from a prior order without using quotation marks or giving attribution to the prior order.[79] And that prior order copied extensively from an order in a separate case, again, without using quotation marks.[80]

These examples are not offered to condone plagiarism on the whole, but to demonstrate that "rules against plagiarism do not rest on some universal philosophical notion; rather, all plagiarism norms are context-specific." *Id*. at 534. So while a rule against plagiarism in schools makes sense "because originality has a unique value in the academic setting," *id*., "one must be wary of painting the professional norms of the academic setting into other realms." *Id*. at 535.

In the litigation context, an expert report is not intended to be a wholly original piece of writing like a research paper in an academic setting. Rather, it is intended to disclose "the basis and reasons" for the expert's opinions and "the facts or data considered by" the expert. Fed. R. Civ. P. 26(a)(2)(B). Where, as here, Dr. Panigrahy relied on literature to support his opinion, it is natural that part of his report would

---

[79] *Compare* Doc. 399 p. 1 ("In this toxic tort case…") *with* Doc. 383 p. 1 ("In this toxic tort case…"); *compare* Doc. 399 p. 2 ("Plaintiffs later submitted…." *with* Doc. 383 p. 2 ("Plaintiffs later submitted…"); *compare* Doc. 399 p. 3 ("Summary judgment is appropriate…" *with* Doc. 393 p. 3 ("Summary judgment is appropriate…"); *compare* Doc. 399 p. 3 ("Expert testimony may be admitted…" *with* Doc. 393 p. 3 ("Expert testimony may be admitted…"); *compare* Doc. 399 p. 3-4 ("With *McClain* categorization decided…" *with* Doc. 383 p. 4 ("With *McClain* categorization decided…").
[80] *Compare* Doc. 383 *with* Doc. 230 in *Davis v. Lockheed Martin Corp.*, No. 6:22-cv-81 (M.D. Fla. Dec. 11, 2023), which is currently on appeal in this Court as Case No. 24-10080.

summarize the literature by using language from the original cited source, in addition to conducting his own causation analysis in other parts of the report.

More importantly for purposes of this appeal, the district court's narrow focus on the issue of plagiarism caused it to miss the forest for the trees, and so it failed to analyze whether the cited literature "provide[s] enough support for [Dr. Panigrahy's] general causation opinion to satisfy *Daubert*'s reliability requirement." *Hendrix*, 609 F.3d at 1199 n. 11. When presented with Defendants' allegations of plagiarism, the question that the district court should have asked was this: What difference would it make under *Daubert* if Dr. Panigrahy had used quotation marks when citing and summarizing studies, or instead provided attribution through endnotes or narratives setting forth the sources of information? The answer is that it does not make any difference under *Daubert*. Either the underlying science reliably supports Dr. Panigrahy's causation opinions or it does not; this conclusion will not change based on the use or non-use of quotation marks in the expert report.

## IV.    The district court abused its discretion by finding IARC conclusions insufficient to support causation without evaluating the epidemiology, animal studies, and mechanisms of action.

Although the district court found that "plagiarism in itself is sufficient reason for exclusion,"[81] it nonetheless dedicated a couple pages of its decision toward

---

[81] Doc. 399 p. 8.

explaining that IARC findings are insufficient to show general causation.[82] Regardless of whether that is true, it is irrelevant when Dr. Panigrahy has cited hundreds of studies in his causation analysis that the district court entirely ignored.[83] For example, in his analysis of kidney cancer, Dr. Panigrahy found that IARC's classification "lends support to a casual relationship" but the vast majority of his kidney cancer analysis focuses on epidemiology, animal studies and mechanisms of action.[84]  Essentially, the district court's reasoning seems to be that if a causation expert relies on IARC to any extent, then the expert's opinion is unreliable as a matter of law regardless of what the science as a whole says about causation.

The fallacy in the district court's reasoning is apparent when considering other substances classified by IARC. For example, IARC has classified tobacco smoke as

---

[82] Doc. 399 p. 8-10.

[83] *See* Argument Section I; Doc. 136-1 p. 363-73 (studies applicable to kidney cancer); id. at 373-79 (studies applicable to breast cancer); id. at 380-92 (studies applicable to blood cancers); id. at 392-400 (studies applicable to thyroid cancer); id. at 400-08 (studies applicable to pancreatic cancer); 408-20 (studies applicable to liver and bile duct cancer); id. at 420-32 (studies applicable to lung cancer); id. at 432-39 (studies applicable to testicular cancer); id. at 439-45 (studies applicable to anal cancer); id. at 445-51 (studies applicable to brain cancer); Doc. 136-2 p. 61-66, 76-82, 93-111, 114-115, 129-140, 154-163 (charts summarizing studies); Doc. 211-2 (chart pointing to studies).

[84] *See* Doc. 136-1 p. 372 (finding IARC classifications to "lend[] support"); Doc. 136-1 p. 363-73 (discussing the epidemiology, animal studies and mechanisms of action that support causation).

a human carcinogen[85] and this Court has acknowledged the same. *See McClain*, 401 F.3d at 1239. Nonetheless, the district court would exclude an expert who cites the IARC monograph on tobacco smoke as part of a causation analysis because, according to the district court, "research agencies like IARC are, understandably, focused on protecting public health and recommending protective standards, rather than evaluating causation from an expert standpoint in the litigation context."[86] Obviously, excluding such an expert would be an error if, like Dr. Panigrahy, the expert also relied on epidemiology, animal studies, and mechanisms of action to show that tobacco smoke causes cancer.

Moreover, the district court's characterization of the IARC is not correct, making its reliance on *McClain* and *Williams* misdirected. The IARC is not "focused on protecting public health and recommending protective standards"[87] like the government agencies at issue in *McClain* and *Williams*.[88] Rather, IARC states that "no recommendation is given with regard to regulation or legislation, which are the

---

[85] IARC Monograph Vol. 83 p. 1187 ("There is *sufficient evidence* in humans that tobacco smoking causes cancer…"), available at
https://publications.iarc.fr/_publications/media/download/2636/1567f1ed6fa20d5ef35978ef5b585b63e6101379.pdf
[86] Doc. 399 p. 8.
[87] Doc. 399 p. 8
[88] *McClain* involved an expert who relied on FDA recommendations, *see* 401 F.3d at 1249, and *Williams* involved an EPA emissions standard. *See* 889 F.3d at 1246-47.

responsibility of individual governments or other international organizations."[89] Its objective "is to prepare, with the help of international Working Groups of experts, and to publish in the form of *Monographs*, critical reviews and evaluations of evidence on the carcinogenicity of a wide range of human exposures."[90]

Further, the district court's reliance on *Allen* only serves to reinforce its error. In *Allen*, unlike the district court, the Fifth Circuit "examine[d] each of the types of evidence on which appellants' experts rely: epidemiological studies, animal studies, cell biology, and health organization conclusions" to determine if EtO could cause brain cancer. *Allen v. Pennsylvania Engr. Corp.*, 102 F.3d 194, 196 (5th Cir. 1996). The court's exclusion of the expert was based on the fact that "not a single scientific study has revealed a link between human brain cancer and EtO exposure." *Id*. at 197. Thus, *Allen* did not turn on the insufficiency of IARC evidence; instead *Allen* shows that a court must review all of the evidence before determining whether causation can be shown.

The district court's reliance on *Roundup*[91] is even more misguided than *Allen* because in *Roundup* the Ninth Circuit actually affirmed the district court's admission of the general causation opinions that were grounded in epidemiological evidence— thus supporting admission of Dr. Panigrahy's opinions here. *See Hardeman v.*

---

[89] Doc. 136-7 p. 4 (Preamble to IARC Monograph).
[90] Doc. 136-7 p. 3 (Preamble to IARC Monograph).
[91] Doc. 399 p. 9.

*Monsanto Co.*, 997 F.3d 941, 965 (9th Cir. 2021) ("the general causation expert opinions were sufficiently supported by reliable epidemiological evidence, so admitting these experts' testimony was not an abuse of discretion"). As to the IARC evidence, the Ninth Circuit also affirmed "[t]he district court's decision to admit IARC's glyphosate classification as a 'probable carcinogen'…" *Id*. at 967.

So, while it may be true that IARC evidence ***on its own*** cannot prove general causation, that conclusion is irrelevant where, as here, the expert has also relied on epidemiological evidence, animal studies, and mechanisms of action.

## V.    The district court abused its discretion when it found reliability issues that were irrelevant to Dr. Panigrahy's opinions.

In its final criticism of Dr. Panigrahy, the district court found that "several times, he copied lengthy paragraphs from IARC verbatim but conveniently left out sentences…"[92] Stated differently, on one hand the district court faulted Dr. Panigrahy for copying language from the IARC monograph without using quotation marks, and on the other it faulted him for not copying exactly enough.

Regardless, the problem with the district court's finding is that it is not tied to the reliability of any of Dr. Panigrahy's opinions. For example, the court found that Dr. Panigrahy failed to copy the phrase "confounding could not be entirely excluded" from the IARC monograph.[93] However, turning to the IARC monograph,

---

[92] Doc. 399 p. 10.
[93] Doc. 399 p. 10.

that phrase is part of a broad statement about "studies in humans" generally, and so the phrase does not reveal anything about the reliability of a particular study.[94] In contrast, Dr. Panigrahy addressed confounding extensively in his report, both broadly[95] and within specific studies,[96] and he noted when confounding could limit the usefulness of study results.[97] So, while it is true that confounding is an important factor to consider when evaluating study results, the district court did not actually apply this principle to reach a conclusion about the reliability of a study.

By way of example, in *Abilify* the court addressed defendants' argument "that the Etminan Study is unreliable for its failure to control for potential confounders." *In re Abilify (Aripiprazole) Products Liab. Litig.*, 299 F. Supp. 3d 1291, 1322 (N.D.

---

[94] Doc. 136-7 p. 27 ("In studies in humans, associations occurred with cancers of the oesophagus, cervix, and with non-Hodgkin lymphoma, but confounding could not be entirely excluded.").

[95] *See, e.g.,* Doc. 136-1 p. 301 ("In examining epidemiological evidence, several factors need to be considered: … the potential for confounding by other chemicals … and also by lifestyle or social factors"); *id*. at 201 ("One of the main limitations of industry-based cohort studies is the usual absence of information on smoking and other potential confounders…").

[96] *See, e.g.*, Doc. 136-1 p. 71 (noting that Charbotel 2006 "adjust[ed] for the confounding effect of tobacco smoking and BMI"); *id*. at 90 (noting that Bassig 2013 was "adjust[ed] for potential confounders"); *id*. at 112 (noting it "unlikely that confounding or bias could explain the observed association"); *id*. at 249 (noting that in Aschengrau 1993 "potential confounding factors were obtained by telephone or in-person interviews…").

[97] *See, e.g.,* Doc. 136-1 p. 113 (noting possible "uncontrolled confounding to wood dust"); *id*. at 150 (noting the "possibility of some confounding" from co-exposures); *id*. at 318 ("Cigarette smoking could not be ruled out as a confounding variable."); *id.* at 323 ("The remaining studies were less informative as a result of their small sample size or confounding co-exposures.").

Fla. 2018). After a discussion about confounding and "[a]pplying these principles to this case," the court held that "Defendants' objections based on potential confounding variables do not affect the Study's admissibility. '[V]igorous cross-examination' and 'presentation of contrary evidence' are the appropriate means of attacking the Study's limitations." *Id*. at 1322-25 (quoting *Daubert*, 509 U.S. at 595). And this Court would concur. *See Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) ("in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility") (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)).

In this case, if Defendant had raised concerns about confounding (it did not) or any other study limitations, the appropriate way for the district court to assess those issues would be through analyzing the reliability of the study in question. Having not engaged in such an analysis, the district court's finding about missing language in Dr. Panigrahy's report is untethered to any valid objection about reliability.

## VI.    The district court abused its discretion by dismissing Plaintiffs' claims without addressing their other causation experts.

The Plaintiffs in this appeal have disclosed additional general causation experts, Drs. Cowan and Kendall, that the district court did not address before dismissing Plaintiffs' claims on the basis of finding no reliable general causation

testimony.[98] The reliability of Dr. Cowan's and Dr. Kendall's opinions were briefed in the district court but no decision has been issued.[99] Briefly, Drs. Cowan and Kendall offered background risk opinions in support of general causation,[100] and Dr. Kendall also concurred in Dr. Panigrahy's general causation opinions from the standpoint of a toxicologist.[101]

Additionally, the district court indicated that it was "tak[ing] general and specific causation up on the full scientific record" but failed to address any of Plaintiffs' specific causation experts before dismissing their claims. Plaintiffs' specific causation experts include Dr. Sahu who modeled Lockheed's chemical emissions to show the exposures suffered by Plaintiffs,[102] as well as Dr. Panigrahy and Dr. Schmidt who conducted differential diagnoses to rule in and out the potential causes of Plaintiffs' cancers.[103]

Failing to address these experts before dismissing Plaintiffs' claims was an abuse of discretion. *Moore*, 633 Fed. Appx. at 930 (holding that the district erred by disregarding expert evidence in a summary judgment ruling because the court "must consider *all evidence* in the record") (emphasis by Court).

---

[98] Doc. 399 p. 11.
[99] *See* Doc. 151 and Doc. 169 (Kendall); Doc. 317 and Doc. 341 (Cowan).
[100] Doc. 150-1 p. 7-10, Doc. 298-2.
[101] Doc. 150-1 p. 5-6.
[102] Doc. 273-6.
[103] Doc. 275-2 (Dr. Panigrahy's specific causation report); Doc. 276-2 (Dr. Schmidt's specific causation report).

CONCLUSION

The district court cannot avoid its duty to review the evidence underpinning an expert's opinion by excluding the expert on the basis of a credibility issue that is reserved exclusively for the jury. For that reason, the district court's decision excluding Dr. Panigrahy should be reversed.

Dated: August 5, 2024                          Respectfully submitted,


/s/ Josh Autry                                 /s/ Rene F. Rocha
Josh Autry                                     Rene F. Rocha
Morgan & Morgan                                Morgan & Morgan
333 W Vine St, Ste 1200                        400 Poydras St, Ste 1515
Lexington, KY 40507                            New Orleans, LA 70130
859-899-8785                                   954-318-0268
jautry@forthepeople.com                        rrocha@forthepeople.com

                                               /s/ Adam P. Bergeron
                                               Adam P. Bergeron
                                               Morgan & Morgan
                                               47 Maple St, Ste 104D
                                               Burlington, VT 05401
                                               407-974-2075
                                               adambergeron@forthepeople.com

*Attorneys for Appellant Michael Davis*

CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts exempted by Fed. R. App. P. 32(f), this brief contains 9,765 words.

*/s/ Adam P. Bergeron*