# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

CASE NO. 24-12047-H

---

ARTHUR ANDERSON, et al.,

*Plaintiffs-Appellants,*

v.

LOCKHEED MARTIN CORPORATION, et al.,

*Defendants-Appellees.*

---

## BRIEF OF DEFENDANT-APPELLEE
## LOCKHEED MARTIN CORPORATION

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

---

Brigid F. Cech Samole
GREENBERG TRAURIG, P.A.
333 S.E. Second Avenue, Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
Brigid.CechSamole@gtlaw.com
miamiappellateservice@gtlaw.com

David B. Weinstein
Ryan T. Hopper
GREENBERG TRAURIG, P.A.
101 East Kennedy Blvd., Suite 1900
Tampa, Florida 33602
Telephone: 813.318.5700
weinsteind@gtlaw.com
hopperr@gtlaw.com

*Counsel for Defendant-Appellee Lockheed Martin Corporation*

***ARTHUR ANDERSON, ET AL. V. LOCKHEED MARTIN CORPORATION, ET AL.***
**CASE NO. 24-12047-H**

## CERTIFICATE OF INTERESTED PERSONS AND
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellee, Lockheed Martin Corporation, submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this review:

1.  Albanis, Panagiotis V. - Counsel for Plaintiff-Appellant

2.  Anderson, Arthur

3.  Appel, Marie N.

4.  Autry, Josh - Counsel for Plaintiff-Appellant

5.  Bergeron, Adam P. - Counsel for Plaintiff-Appellant

6.  Brackett, Elizabeth

7.  Brunelle, Justin

8.  Brunelle, Meredith

9.  Cech Samole, Brigid F. – Counsel for Defendant-Appellee

10. Citera, Francis A. – Counsel for Defendant-Appellee

11. Dalton, Jr., The Honorable Roy B. – District Court Judge

12. DeMilt, Donna

13. Ebert, Andrew

14. Estate of Carol Davis

**CERTIFICATE OF INTERESTED PERSONS AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**
**(Continued)**

15.  Flury, Katherine

16.  Goertz, Donald

17.  Goldrosen, Eiten - Counsel for Plaintiff-Appellant

18.  Goldschmidt, Elaine

19.  Goldschmidt, Victor

20.  Goodson, Logan

21.  Greenberg Traurig, LLP – Counsel for Defendant-Appellee

22.  Greenberg Traurig, P.A. - Counsel for Defendant-Appellee

23.  Havens, Brendan

24.  Henderson, Craig

25.  Hopper, Ryan T. - Counsel for Defendant-Appellee

26.  Innes, Andrew

27.  Innes, Morgan

28.  Irick, The Honorable Daniel C. – District Court Magistrate Judge

29.  Jackson, Raymond D - Counsel for Defendant-Appellee

30.  Jarecki, Shawn K. - Counsel for Plaintiff-Appellant

31.  Juda, Laura

32.  Juda, Mark

**CERTIFICATE OF INTERESTED PERSONS AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**
**(Continued)**

33.     Kantor, Daniel

34.     Kantor Neurology

35.     Kemp, Brian

36.     Kemp, Kelly

37.     Kendall, Ronald J.

38.     Khasin, Irina - Counsel for Defendant-Appellee

39.     Kiely, Kevin

40.     Komatsu, Naho

41.     Komatsu, Naoyuki

42.     Kozak, Jeff

43.     Lockheed Martin Corporation LMT - Defendant-Appellee

44.     McGarry, Ann

45.     McGarry, Michael

46.     Miller, Gretchen N. - Counsel for Defendant-Appellee

47.     Moore, Joshua D.

48.     Morgan, T. Michael – Counsel for Plaintiff-Appellant

49.     Morgan & Morgan, P.A. - Counsel for Plaintiff-Appellant

50.     Muddell, Jeffrey

**CERTIFICATE OF INTERESTED PERSONS AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**
**(Continued)**

51.    Muddell, Stephanie

52.    Outing, Marie

53.    Panigrahy, Dipak

54.    Petosasa, Frank M. - Counsel for Plaintiff-Appellant

55.    Porter, Bryan C. - Counsel for Defendant - Appellee

56.    Ram, Michael F. - Counsel for Plaintiff-Appellant

57.    Ramsey, Patricia

58.    Reese, Deborah

59.    Rocha, Rene F. - Counsel for Plaintiff-Appellant

60.    Ross, Renee

61.    Rutledge, Eric

62.    San Martin, Emilio

63.    Sahu, Ranajit (Ron)

64.    Sheen, Kristen

65.    Slusarz, Brian

66.    Stone, Wendy

67.    Torres, Christopher - Counsel for Defendant - Appellee

68.    Tosti, Helen

**CERTIFICATE OF INTERESTED PERSONS AND
<u>CORPORATE DISCLOSURE STATEMENT</u>**
**(Continued)**

69.    Tosti, John

70.    University City Property Management Company III, LLC

71.    Weinstein, David B. – Counsel for Defendant-Appellee

72.    White, Brenda

73.    White, Christopher R. – Counsel for Defendant-Appellee

74.    Winn, Jennifer N. - Counsel for Plaintiff-Appellant

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Defendants-Appellee, Lockheed Martin Corporation, make the following statement as to corporate ownership:

Defendant-Appellee, Lockheed Martin Corporation, hereby discloses that it is a company headquartered in North Bethesda, Maryland, and that no publicly held corporation owns 10% or more of its stock.

    /s/ David B. Weinstein    
David B. Weinstein

## STATEMENT REGARDING ORAL ARGUMENT

Because the issues raised by Appellants can be addressed on the briefs, the record, and governing case law, Appellee submits that oral argument would not be of material benefit to the Court.

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...............................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF CITATIONS ......................................................................................... v

STATEMENT OF JURISDICTION ....................................................................... 1

STATEMENT OF THE CASE ................................................................................ 1

   I.   Nature of the case. ..................................................................................... 1

   II.  Statement of the Facts, Course of Proceedings, and Disposition
       Below ........................................................................................................ 3

   III. Scope and Standards of Review ................................................................ 6

SUMMARY OF ARGUMENT ............................................................................... 8

ARGUMENT ........................................................................................................ 10

   I.   The District Court acted well within its discretion in excluding
       Dr. Panigrahy's general-causation opinions for "rampant plagiarism"
       and consequently granting summary judgment for Lockheed Martin. ........ 10

       A.   The Bradford Hill analyses Dr. Panigrahy claimed to have
              performed placed his epidemiological judgment squarely at
              issue. ............................................................................................... 10

       B.   The "foundations" of Dr. Panigrahy's epidemiological analyses
              were plagiarized from IARC scientists whose undisclosed
              conclusions contradicted his own opinions. ....................................... 13

       C.   Based on Dr. Panigrahy's plagiarism and related methodological
              misrepresentations, the District Court appropriately found
              Appellants to have failed to demonstrate the admissibility of
              Dr. Panigrahy's opinions under Rule 702. .......................................... 16

1.  The plagiarized IARC analyses differ dramatically from general-causation inquiries in toxic-tort cases. ..........................17

2.  The plagiarism strongly suggests that Dr. Panigrahy did not even read the studies he cited, let alone form his own judgments about them...............................................................19

3.  Dr. Panigrahy failed to meet the intellectual standards to which he would be held in his own field....................................21

4.  Dr. Panigrahy's efforts to obscure his plagiarism reflect deliberate attempts to disguise the methods he really used to develop his expert report. ........................................................22

D.  The District Court had no obligation to independently review the more than 1,100 studies Dr. Panigrahy cited; the unreliability of his opinions was apparent from his report and testimony..................24

II.  Summary judgment was independently warranted for Lockheed Martin because Dr. Panigrahy's "no safe dose" general-causation opinions failed to establish a nonspeculative basis for inferring probable causation.......................................................................................25

A.  General-causation evidence must be tailored to potentially relevant exposure levels and must lay a groundwork for risk comparisons.......................................................................................26

B.  Dr. Panigrahy offered "no safe dose" opinions that fail to establish a "harmful level of exposure" under this Circuit's precedents. ........................................................................................30

C.  Dr. Panigrahy's failure to tailor his opinions to potentially relevant exposure levels precluded Appellants from establishing a genuine issue of material fact on general causation. ........................34

1.  Appellants improperly persuaded the District Court to defer consideration of dose-response issues based on a misreading of *McClain* that this Circuit recently rejected. .........36

iii

2.  Appellants also erroneously convinced the District Court that epidemiology-based general-causation opinions need not establish "harmful levels" of exposure. ..................................39

3.  A correct interpretation of *McClain* and this Circuit's "indispensable methodologies" compels summary judgment for Lockheed Martin based on Dr. Panigrahy's failure to establish harmful exposure levels. ..............................43

D.  The Bellwether Group I specific-causation proceedings—including Appellants' disclosure of modeled exposure levels that were millions of times lower than any levels identified in Dr. Panigrahy's epidemiology—go to show why general-causation opinions canno ignore potentially relevant exposure conditions. .........................................................................44

III.  Drs. Kendall and Cowan could not have and did not purport to have established general causation. ....................................................53

CONCLUSION ..................................................................................................55

CERTIFICATE OF COMPLIANCE ....................................................................56

CERTIFICATE OF SERVICE ..............................................................................56

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Allen v. Pennsylvania Eng'g Corp.*,
102 F.3d 194 (5th Cir. 1996) ............................................................18

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014) ..................................34, 37, 39, 50

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998) .........................................................43

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)...............................................................*passim*

*In re Deepwater Horizon BELO Cases*,
119 F.4th 937 (11th Cir. 2024) ..............................................*passim*

*In re Deepwater Horizon BELO Cases*,
No. 20-14544, 2022 WL 104243 (11th Cir. Jan. 11, 2022) ........35, 42

*In re Deepwater Horizon Belo Cases*,
No. 3:19-cv-963, 2020 WL 6689212 (N.D. Fla. Nov. 4, 2020) ..............19, 42

*In re Deepwater Horizon Belo Cases*,
No. 3:19-cv-963-MCR-HTC, 2022 WL 17721595 (N.D. Fla. Dec.
15, 2022) ..........................................................................................34

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*,
402 F.3d 1092 (11th Cir. 2005) .......................................................53

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*,
609 F.3d 1183 (11th Cir. 2010) .......................................................41

*Gooding v. Univ. Hosp. Bldg., Inc.*,
445 So. 2d 1015 (Fla. 1984) ...............................................27, 28, 52

*Guinn v. AstraZeneca Pharm. LP*,
602 F.3d 1245 (11th Cir. 2010) ..............................................*passim*

*Kilpatrick v. Breg, Inc.*,
   613 F.3d 1329 (11th Cir. 2010) .............................................................7, 25, 50

*Knight v. Kirby Inland Marine Inc.*,
   482 F.3d 347 (5th Cir. 2007) ............................................................................42

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)..............................................................................7, 21, 24

*Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*,
   483 F.3d 773 (11th Cir. 2007) ...........................................................................1

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) .................................................................*passim*

*McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*,
   869 F.3d 246 (3d Cir. 2017) .............................................................................51

*Pinares v. Raytheon Techs. Corp.*,
   No. 19-14831, 2023 WL 2661521 (11th Cir. Mar. 28, 2023) ...............27, 34, 47

*Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*,
   No. 6:15-cv-641-Orl-28TBS, 2017 WL 11457208 (M.D. Fla. Apr.
   13, 2017) .....................................................................................................22, 23

*United States v. Cameron*,
   907 F.2d 1051 (11th Cir. 1990) ..........................................................................7

*Williams v. Int'l Paper Co.*,
   No. CV 108-45, 2009 WL 10678630 (S.D. Ga. July 19, 2009) ........................36

*Williams v. Mosaic Fertilizer, LLC*,
   889 F.3d 1239 (11th Cir. 2018) ...................................................................24, 36

*Williams v. Mosaic Fertilizer, LLC*,
   No. 8:14-CV-1748-T-35MAP, 2016 WL 7175657 (M.D. Fla. June
   24, 2016) ...........................................................................................................36

*Witt v. Stryker Corp. of Michigan,*
 648 F. App'x 867 (11th Cir. 2016) ....................................................43

*Wright v. Willamette Indus., Inc.,*
 91 F.3d 1105 (8th Cir. 1996) ...........................................................52

*In re Zantac (Ranitidine) Products Liab. Litig.,*
 644 F. Supp. 3d 1075 ......................................................................34

*In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.,*
 858 F.3d 787 (3d Cir. 2017) ......................................................11, 20

**Statutes**

28 U.S.C. § 1442 ...................................................................................1

**Other Authorities**

Fed. R. Civ. P. 54 ..............................................................................1, 6

Fed. R. Evid. 702 .........................................................................*passim*

REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 549 (Fed. Jud. Ctr., 3d
 ed. 2011) .................................................................................*passim*

Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. c(1)
 (2010) ............................................................................................27, 28

Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. b (2010)................29

Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. c(4)........................49

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). (Doc. 80.) This Court has jurisdiction pursuant to a properly certified Rule 54(b) partial final judgment. *See Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007). The judgment on appeal was entered on May 31, 2024, and Appellants timely appealed on June 21, 2024. (Docs. 422, 424, 432.)

## STATEMENT OF THE CASE

### I. Nature of the case.

As is common in toxic-tort cases, Appellants made a highly complex claim—that they or their family members developed cancers not from any medically recognized cause, but from inhaling five common industrial substances allegedly emitted from a Lockheed Martin facility. Appellants did not work there (they worked at an office building the better part of a mile away), but they nonetheless maintained that proximity to the facility would have exposed them to enough of the emissions to cause their cancers.

Appellants built their claims around general-causation testimony proffered by Dr. Dipak Panigrahy, a cancer researcher and faculty member of Harvard Medical School. Dr. Panigrahy produced an expansive 526-page expert report ostensibly citing more than 1,100 scientific studies. Based on the analyses in the report, which

he insisted were his own and "unique to this case," Dr. Panigrahy opined that all of the substances at issue in this case are capable of causing all of Appellants' cancer types—at *any* dose.

In discovery, Lockheed Martin uncovered two facts that ensured the unreliability of Dr. Panigrahy's opinions. First, he had not made any effort to tailor his general-causation opinions to any doses of any substance that Appellants might plausibly have encountered. This was partially because Appellants' counsel had not, at that time, developed even *preliminary* exposure estimates (an exercise Lockheed Martin maintains should have occurred before this action was filed). Second, and more directly relevant to the outcome below, Dr. Panigrahy had not only plagiarized *hundreds* of pages of his expert report from "*Monographs*" prepared by the International Agency for Research on Cancer (IARC), he had also overstated the underlying scientific data by excising portions of the plagiarized materials that cut against causal conclusions. Based on these latter methodological failures (including evidence that Dr. Panigrahy likely didn't read beyond the abstract of *any* study he cited), the District Court concluded that Dr. Panigrahy's plagiarism was "so blatant that it represents a deliberate lack of candor" that caused his analyses to be "unreliable enough to justify exclusion." (*See* Doc. 399 at 6, 11–12.) The District Court consequently excluded Dr. Panigrahy's opinions and granted summary judgment for Lockheed Martin.

Appellants now contend that the District Court abused its discretion in excluding Dr. Panigrahy's opinions, and that Dr. Panigrahy's plagiarism presented only a credibility issue that should have been left to the jury. But Appellants are wrong. Dr. Panigrahy's plagiarism reflected intentional misconduct aimed at obscuring methodological flaws bearing directly on the unreliability of his opinions. And even if the District Court had not chosen Dr. Panigrahy's plagiarism as the primary basis for excluding his opinions, summary judgment would still have been required because Dr. Panigrahy's opinions reduce to speculative "no safe dose" theories that fail to meet this Circuit's standards for establishing a genuine issue of material fact on summary judgment. The judgment below should be affirmed.

## II. Statement of the Facts, Course of Proceedings, and Disposition Below.

Appellants are a subset of the Plaintiffs in this action, most of whom worked or had family members who worked at a Golf Channel building near SLRC. (Doc. 89.) Appellants sued Lockheed Martin under negligence, strict-liability, and nuisance theories. (*Id.* ¶¶ 269–328.)

The court imposed staggered expert-disclosure and motions deadlines. (Doc. 81 at 2–3.) Expert reports and related motions on general causation were due first for all Plaintiffs, after which the specific causation and other issues were to be taken up in three "Bellwether Group" phases. (*Id.*)

During the general-causation phase, Appellants proffered expert opinions from Dr. Panigrahy, who opined that Appellants' forms of cancer can likely be caused by inhalation of five specific solvents: PCE, TCE, styrene, toluene, and xylene.  (Doc. 136-1.)  Appellants also proffered reports from the statistician Dr. Cowan, who compared mortality rates in the SLRC ZIP code to those in other ZIP codes (Doc. 298-2), and from the toxicologist Dr. Kendall, who stated that he shared Dr. Panigrahy's opinions and that Dr. Cowans' statistical analyses lent toxicological plausibility to the notion that SLRC emissions increased mortality rates in the surrounding ZIP code.  (Doc. 150-1.)  Following expert depositions, Lockheed Martin moved to exclude Dr. Panigrahy's general-causation opinions as unreliable (Doc. 139) and moved for summary judgment on all claims that depended on his testimony (Doc. 152).  The District Court held a full-day hearing on the general-causation *Daubert* and summary judgment issues.  (Doc. 210-1 (Lockheed Martin's hearing presentation); Doc. 431-1 (transcript).)

The Parties then proceeded to specific causation.  Appellants David Berry, Kirsten Sheen, Wendy Stone, Naoyuki Komatsu, Brian Kemp, and Morgan Innes were part of Bellwether Group I.  They disclosed an expert report from environmental engineer Dr. Sahu, who purported to estimate Lockheed Martin's contributions to concentrations of PCE, TCE, styrene, hexavalent chromium, and arsenic in the air around the Golf Channel building.  (*See* Doc. 275-8 at 79.)

Appellants also disclosed specific-causation reports from Dr. Panigrahy, who opined that inhalation of the five substances at issue in the concentrations modeled by Dr. Sahu was the probable cause of the Bellwether Group I Appellants' cancers. (Docs. 275-2, 275-7.) Following a second round of depositions, Lockheed Martin moved to exclude Dr. Panigrahy's specific-causation opinions (Doc. 310) and for summary judgment on specific causation (Docs. 318 (motion), 356 (reply), 373 (supplemental briefing)).

The District Court issued an interim summary judgment order in September 2023. (Doc. 370.) In it, the District Court concluded that the substance/response relationships at issue fell into *McClain* "category two," meaning that the "medical community" does *not* generally recognize the substances to cause "the type of harm alleged." (*Id.* at 4 (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233 (11th Cir. 2005)).) It also interpreted *McClain* as not requiring general-causation opinions to be tailored to case-relevant exposure conditions (i.e., plausible doses that plaintiffs expected to later prove they experienced), so it rejected Lockheed Martin's *Daubert* and summary judgment arguments that focused on dose-response issues. (*Id.* at 15–22.) The District Court deferred all other rulings, indicating that it would decide the pending motions on the "full scientific record" (that is, the general and specific-causation filings). (*Id.* at 21.)

A final order followed in March 2024, in which the District Court granted Lockheed Martin's motions to exclude Dr. Panigrahy's general-causation testimony, which, in turn, required summary judgment for Lockheed Martin on all of Appellants' claims.  (Doc. 399.)  In sum, the District Court found that Dr. Panigrahy's expert report was the product of "rampant plagiarism" from IARC *hs*, which are sources prepared by a regulatory advisory agency that focuses on "protecting public health" and therefore employs different causal analyses than are appropriate "in the litigation context." (*Id.* at 5–8, 11.)  The District Court further observed that Dr. Panigrahy had "conveniently left out sentences in which IARC urged caution about the limitations of its findings, misleadingly presenting the science as more definitive than it actually is." (*Id.* at 10–11 (collecting citations).) These issues led the District Court to conclude that Dr. Panigrahy's "general causation methodology as a whole is too unreliable to put before a jury." (*Id.* at 11.)

The District Court entered judgment for Lockheed Martin under Rule 54(b) and this appeal followed.  (Docs. 422, 424, 432.)

## III.  Scope and Standards of Review.

Appellants do not contest that an affirmance of the District Court's decision to exclude Dr. Panigrahy would require affirmance of the summary judgment for Lockheed Martin.  This appeal thus principally requires review of the exclusion of

his testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

> This Court reviews a trial court's decision to exclude an expert's testimony pursuant to *Daubert* under an abuse of discretion standard. This standard of review requires that [the Court] defer to the district court's ruling unless it is manifestly erroneous. Because the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under *Daubert* . . . [the Court gives] the district court considerable leeway in the execution of its duty.

*Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1334–35 (11th Cir. 2010) (cleaned up). This "considerable leeway" means that the "trial court must have the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

This appeal could also require review of the summary judgment under a harmless error standard. "A showing that the district court erred or abused its discretion in excluding evidence does not lead automatically to a reversal." *United States v. Cameron*, 907 F.2d 1051, 1059 (11th Cir. 1990). "Such orders will not be disturbed except upon a showing of abuse of discretion, and then *only upon a showing that such abuse of discretion resulted in substantial harm* to the party seeking relief." *Id.* (cleaned up). The party asserting error bears the burden of proving that the exclusion affected "substantial rights." *See id.* (citation omitted).

## SUMMARY OF ARGUMENT

The District Court appropriately exercised its discretion in excluding Dr. Panigrahy's general-causation opinions and granting summary judgment for Lockheed Martin.

The extensive plagiarism in Dr. Panigrahy's expert report rendered his opinions unreliable for four reasons. First, the plagiarized source materials—IARC *Monographs*—do not reflect analyses capable of supporting general-causation opinions. The standard of proof employed by IARC is lower and more abstract than the causation standards required for toxic-tort cases. And even under this more relaxed standard, IARC has thus far found the available scientific evidence insufficient to establish the overwhelming majority of the causal relationships alleged to exist in this case (44 of 45 of the alleged substance/response relationships). Second, Dr. Panigrahy's plagiarism suggests that he did not actually perform the methodologies he claims—and might not have even read past the abstract of *any* epidemiological study when preparing his expert report. Third, he failed to demonstrate the same rigor in this case as that which is expected of him in his own institution. And fourth, his attempts to obfuscate his plagiarism reflect a deliberate attempt to obscure the methodologies he really employed. All of these issues go squarely to the unreliability of Dr. Panigrahy's opinions, not just his lack of credibility and candor to the District Court.

Moreover, these indicia of unreliability were discernable from Dr. Panigrahy's expert report and deposition testimony. The District Court had no obligation to wade, independently, through hundreds of epidemiological studies in search of a valid basis for Dr. Panigrahy's opinions—particularly when there is good reason to believe Dr. Panigrahy did not scrutinize those studies himself. Appellants' argument that the District Court was required to parse the entire scientific record before excluding Dr. Panigrahy is irreconcilable with the District Court's broad latitude in determining *how* to assess the reliability of expert opinions.

Alternatively, even if the District Court's plagiarism-based exclusion of Dr. Panigrahy's general-causation opinions had been an abuse of discretion (which it was not), Dr. Panigrahy's opinions were nonetheless both inadmissible and insufficient to create a genuine issue of material fact on causation because he (a) failed to tailor his opinions to potentially relevant exposure conditions and (b) failed to lay a groundwork for establishing corresponding risk estimates. Appellants persuaded the District Court that dose-response considerations could be deferred entirely to the specific-causation stage of the case, but this was based on a misinterpretation of *McClain* that this Court recently rejected and a mischaracterization of this Circuit's precedent on epidemiological analyses. A correct application of these legal concepts, which are reviewable de novo, confirms that Dr. Panigrahy's "no safe dose" opinions were inadmissible as a matter of law

and insufficient to survive summary judgment. So summary judgment was required for Lockheed Martin regardless of whether Dr. Panigrahy's "rampant plagiarism" warranted exclusion (which, again, it did).

Nothing about Drs. Kendall or Cowan—the other two experts Appellants fleetingly reference in their brief—changes this outcome. Dr. Kendall's cursory toxicology report, in which he "agreed" with Dr. Panigrahy's opinions but offered no independent analyses, was inadmissible ipse dixit. And neither expert even purported to have performed a "background risk" assessment, nor would such an assessment have altered the outcome of the case. Both experts were immaterial.

## ARGUMENT

**I.    The District Court acted well within its discretion in excluding Dr. Panigrahy's general-causation opinions for "rampant plagiarism" and consequently granting summary judgment for Lockheed Martin.**

### A.    The Bradford Hill analyses Dr. Panigrahy claimed to have performed placed his epidemiological judgment squarely at issue.

Dr. Panigrahy proffered an extraordinarily expansive set of general-causation opinions: He opined that each of seven different substances was capable of causing each of ten different types of cancer. (Doc. 136-1 (initial general-causation report).) He thus admittedly intended to offer at least 70 distinct general-causation opinions— one for each alleged substance/cancer relationship.[1] (Doc. 136-3 at 69:18–70:1.)

---

[1] By the time of the Court's decision to exclude Dr. Panigrahy, Appellants had dropped two of the seven substances Dr. Panigrahy had addressed in his general

Dr. Panigrahy claimed to have formed the bases of these opinions by applying the Bradford Hill criteria to epidemiological and other studies he had identified through literature searches. (Doc. 136-1 at 13–22 (methodology explanation), 359–363 (Hill criteria explanation).) "The Bradford Hill criteria are metrics that epidemiologists use to distinguish a causal connection from a mere association." *In re Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017); *see also In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 941 (11th Cir. 2024) ("*DH BELO II*") (explaining the Hill criteria).

The Hill "guidelines are employed only *after* a study finds an association," and both the interpretation of individual studies and the process of applying the Hill Criteria require considerable "judgment" on the part of "epidemiologists and others interpreting the epidemiologic data." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 549, 598 (Fed. Jud. Ctr., 3d ed. 2011). It is therefore imperative in the toxic-tort context that an expert employing the Hill Criteria explain how he selected, weighed, and synthesized the epidemiological evidence to reach his causal conclusions. *See In re Zoloft*, 858 F.3d at 796 ("To ensure that the Bradford Hill . . . criteria is truly a

---

causation report (111-TCA and formaldehyde), leaving only PCE, TCE, styrene, hexavalent chromium, and arsenic. They had likewise withdrawn any claims relating to glioma, leaving only nine categories of relevant cancer types. This left 45 alleged substance/cancer relationships (five substances times nine cancers). Appellants have stipulated that Dr. Sahu's modeling on the five remaining substances would have applied to all Bellwether groups.

methodology, rather than a mere conclusion-oriented selection process there must be a scientific method of weighting that is used and explained." (cleaned up)).

Dr. Panigrahy disclosed what he characterized as his "Bradford Hill" analyses in a 526-page expert report. The Hill analyses themselves appear toward the end of his report (Doc. 136-1 at 357–445), but the epidemiological studies on which he relied were "broken down in each of the seven [preceding] chemical sections" of his report, which "sets the foundation for the Bradford Hill." (Doc. 136-3 at 43:22–44:17, 45:23–46:5.) The "chemical sections" were hundreds of pages long, making up the bulk of the report.

At his deposition, Dr. Panigrahy acknowledged the importance of reaching and explaining his own causal judgments. It would not be appropriate, he agreed, for him to simply "track" the opinions of other researchers and hold them out as his own. (*See* Doc. 136-3 at 134:22–135:11.) He insisted that all of the analyses in his report, including the "foundation[al]" analyses in the "chemical sections," were his own and "unique to this case." (Doc. 136-3 at 66:25–67:3 ("Q. Okay. So is it fair to say, then, in your reports the selection of literature you reviewed and the analysis is your own and is unique to this case? A. Correct, yes.").)

**B.** **The "foundations" of Dr. Panigrahy's epidemiological analyses were plagiarized from IARC scientists whose undisclosed conclusions contradicted his own opinions.**

The analyses in Dr. Panigrahy's report were not, however, his "own" or "unique to this case." (*Id.*) As the District Court correctly concluded, "there is no question that Dr. Panigrahy extensively plagiarized his report." (Doc. 399 at 6.) The vast majority of his "chemical" sections, including virtually all of the study-specific epidemiological analyses, were lifted from two sources: (1) IARC "*Monographs*" ; or (2) the abstracts—and *only* the abstracts—of studies cited in the *Monographs*.

Contrary to Appellants' attempt to trivialize Dr. Panigrahy's misconduct, his rampant plagiarism was not a matter of omitting "quotation marks." (Appellants' Br. at 21.) That mischaracterization suggests an inadvertent failure to attribute some of the sources in an otherwise independent analysis, which is not what occurred.

The color-coded exhibits used at Dr. Panigrahy's deposition then later presented to the District Court make clear how Dr. Panigrahy really constructed his report. (Doc. 139 at 21 n.21 (compiling comparative citations between highlighted version of Dr. Panigrahy's expert report used at his deposition (Doc. 136-6) and the sources from which he plagiarized (Docs. 136-8–136-64)).)

In short, Dr. Panigrahy evidently worked his way through IARC's *Monographs*, copying the content he found useful and pasting it, without attribution,

into his report.  (*See id.*)  Orange highlighting in the plagiarism exhibits indicates text taken from a *Monograph*:

| Figure 1 |
|---|
| *Dry-cleaning workers*<br><br>Large studies of cohorts of dry-cleaning workers have been conducted in Europe and the USA. Because of the large number of small shops with a few employees each and the high turnover in this industry, the United States National Cancer Institute (NCI) cohort was assembled through union records, as was the NIOSH cohort, while many of the European studies, used census records linked to cancer-registry or mortality data[692-701]. |

| Dr. Panigrahy's Initial Report (Ex. 136-6 at 241.) | IARC *Monographs* Vol. 106 (Doc 136-7 at 238.) |
|---|---|

Periodically, Dr. Panigrahy would break from the *Monograph* ostensibly to expound on its cited studies.  But as the yellow highlighting in the plagiarism exhibits makes clear, all he was really doing was plagiarizing summaries from the studies' abstracts.

| Figure 2 |
|---|
| Blair et al (1979) studied the causes of death among laundry and dry cleaning workers[692]. To make a preliminary determination as to whether a potential health hazard exists for workers exposed to dry cleaning solvents (which includes carbon tetrachloride, TCE, and PCE), the causes of death were analyzed in 330 deceased laundry and dry cleaning workers[692]. The increased risk for malignant neoplasms resulted primarily from an excess of lung and cervical cancer and slight excesses of leukemia and liver cancer[692]. While the number of deaths were small, the increased risk of cancer noted in these studies emphasized the need for additional epidemiologic studies of this occupational group[692]. Follow-up studies by Blair et al (1990) reported on the mortality among |

| Dr. Panigrahy's Initial Report (Ex. 136-6 at 241.) | Blair 1979 Abstract (Ex. 136-10 at 1.) |
|---|---|

Notably, the study citations in the electronic versions of the *Monographs*

contain hyperlinks to online versions of the studies' abstracts. So the composition of Dr. Panigrahy's expert report is entirely consistent with him plagiarizing his way through IARC *Monographs*, periodically clicking on the hyperlinked citations and plagiarizing from their abstracts, then returning to the *Monographs* without *ever reading the actual bodies of the cited studies*. (*See* Doc. 210-1 at 173–79 (presentation slides showing how Dr. Panigrahy's report construction is consistent with copying from only the hyperlinked abstracts).)

Perhaps worst of all, Dr. Panigrahy systematically deleted lines from plagiarized source material that either cut against a finding of carcinogenicity or would have revealed IARC's scientists as the true authors of the text in his report. For example, Figure 3 demonstrates Dr. Panigrahy's plagiarism of the Working Group's discussion of Blair 2003 *except* for (a) an observation that there was "little evidence of an exposure-response effect" and (b) references to the Working Group as the paragraph's authors.

| Figure 3 | |
|---|---|
| 2.9 (95% CI, 0.6–9.5, three deaths). The size of the cohort and the extended follow-up made this a valuable study. The higher mortality for cancer of the bladder after the introduction of PCE supported the involvement of an occupational rather than a lifestyle risk factor[184,694]. | was 2.9 (95% CI, 0.6–9.5, three deaths). [The size of the cohort and the extended follow-up made this a valuable study. There was little evidence of an exposure–response effect, but the Working Group noted that the higher mortality for cancer of the bladder after the introduction of tetra-chloroethylene supported the involvement of an occupational rather than a lifestyle risk factor. The Working Group also noted, however, that mortality from cancer of the oesophagus was in excess, possibly supporting an effect of smoking.] |
| Dr. Panigrahy's Initial Report (Ex. 136-6 at 244.) | IARC *Monographs* Vol. 106 (Doc 136-7 at 246.) |

Over the course of Dr. Panigrahy's general-causation deposition, Lockheed Martin's counsel worked through the full 18-page PCE section with him. (*See* Doc. 136-3 at 178:24–274:13.) In this *entire* report section, Dr. Panigrahy was unable to identify "a single sentence discussing one of the underlying studies that does not come from either the IARC monograph or the abstract of a study cited by an IARC working group." (*Id.* at 265:18–272:9.)

To round out the plagiarism evidence, Lockheed Martin provided the District Court with an annotated version of Dr. Panigrahy's expert report that was more expansively analyzed than the version used at his deposition. (*See* Doc. 136-4 (annotated report).) The pages of the annotated version alternate between highlighted excerpts of Dr. Panigrahy's original report and then explanations of the source material from which Dr. Panigrahy highlighted. (*See id.*) The explanations also include numerous examples in which Dr. Panigrahy "left out" words or lines from the plagiarized sources that should have tempered or otherwise contradicted his ultimate causal conclusions. (*See id.*) As the annotation indicates, *hundreds* of pages of Dr. Panigrahy's expert report were plagiarized.

**C.    Based on Dr. Panigrahy's plagiarism and related methodological misrepresentations, the District Court appropriately found Appellants to have failed to demonstrate the admissibility of Dr. Panigrahy's opinions under Rule 702.**

As Lockheed Martin argued below, the selective plagiarism evinced in Dr. Panigrahy's report reflects a serious *methodology* problem, not just a credibility

issue.  This is so for four reasons.

### 1.  The plagiarized IARC analyses differ dramatically from general-causation inquiries in toxic-tort cases.

The analyses Dr. Panigrahy plagiarized from IARC's *Monographs* are different in kind from the type of analysis required to establish general causation in a toxic-tort case.  IARC *is* a regulatory advisory body with prophylactic, cancer-prevention objectives.  Appellants' argument otherwise (Appellants' Br. at 36–37) overlooks IARC's express recognition that "[t]he *Monographs* are used by national and international authorities to make risk assessments, formulate decisions concerning preventative measures, provide effective cancer control programmes and decide among alternative options for public health decisions" (Doc. 136-7 at 9).

As addressed more thoroughly in Argument Section II below, IARC's standards for assessing causation are substantially lower than those required in toxic-tort cases.  IARC's *Monograph* Working Groups do not consider probabilities of causation because their goal is to identify all cancer hazards, even those that pose "very low" risks.  (*Id.* at 9.)  They can also arrive at causal conclusions exclusively based on animal and mechanistic studies, which are considered "secondary" evidence in this Circuit.  (*See id.* at 27–28.) And even when a Working Group concludes that a substance "probably" causes *some* cancers under *some* circumstances, "probably" does not mean more likely than not; it is simply a descriptor with "no quantitative significance" (*id.* at 28), which was a nuance

Dr. Panigrahy failed to grasp. (Doc. 36-3 at 131:21–132:4.) So even if IARC's Working Groups had found that the substances at issue in this case can cause, or probably can cause, the types of cancer at issue, the analyses that led to those conclusions would not support a general-causation opinion in a toxic-tort case. *See, e.g.*, *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996) (reasoning that "advisory bodies such as IARC" use a "threshold of proof [that] is reasonably lower than that appropriate in tort law").

How to interpret IARC causation findings is largely academic here, however, because IARC's Working Groups almost universally concluded that the studies they reviewed were *not* sufficient to establish causal relationships with Appellants' forms of cancer. All of those potential relationships had been studied by IARC's Working Groups, and only one causal relationship (TCE and kidney cancer)[2] had been identified under IARC's standards. For *all 44* of the other alleged relationships (including all of the relationships at issue in specific-causation Bellwether Group I), IARC found the available evidence insufficient to draw causal conclusions. (*See* Doc. 210 at 259–303 (collecting *Monograph* excerpts).) Put differently, in all but one instance, the very analyses Dr. Panigrahy plagiarized led the Working

---

[2] Lockheed Martin's expert epidemiologist opined that the TCE/kidney-cancer association IARC identified was the result of recall or reporting bias among study subjects who experienced "very high-level occupational exposures" that could not have occurred here. (*See* Doc. 156-1 at 54.)

Groups to conclusions that contradicted his own—a point Dr. Panigrahy never disclosed in his general-causation reports.[3]  Good science, and any reliable application of methodologies Dr. Panigrahy claimed to have employed, would have required him to acknowledge these differing conclusions and engage the underlying points with which he disagreed.

>        2.    **The plagiarism strongly suggests that Dr. Panigrahy did not even read the studies he cited, let alone form his own judgments about them.**

Dr. Panigrahy's plagiarism also casts substantial doubt on whether he actually took the steps required of the methodologies he claimed to have performed.  For instance, scrutinizing study designs and evaluating potential confounders are critical steps to any epidemiological analysis; they inform not only the causal inferences that can be drawn from an association, but also whether a study revealed a valid association in the first instance.  *See In re Deepwater Horizon Belo Cases*, No. 3:19-cv-963, 2020 WL 6689212, at *12 (N.D. Fla. Nov. 4, 2020) ("[W]hen evaluating epidemiologic evidence, 'the methodological soundness of a study . . . must be assessed,' with 'the key questions' being whether a study's limitations compromise its findings and the extent to which the study permits an inference regarding

_____

[3] Dr. Panigrahy later admitted to the contradiction between his own conclusions and IARC's on the cancers at issue in Bellwether Group I.  (Doc. 280-1 at 130:21–131:1 ("Q.  IARC has not concluded for TCE, PCE, styrene, hexavalent chromium, or arsenic, that there is sufficient evidence of carcinogenicity in humans under any exposure conditions, right?  [A.]  Correct.  Correct.").)

causation." (quoting REFERENCE MANUAL at 553–54)). Yet every observation about every study cited in the PCE "chemical" section of his report, for instance, came from either the *Monograph* or plagiarized portions of study abstracts. Dr. Panigrahy admitted that he did not *always* read the "entire" cited studies (Doc. 136-3 at 36:24-37:13), but the lack of any observations—or even any plagiarized text—from the *body* of any study implies he might *never* have read beyond a study's abstract. Forming an epidemiological expert opinion based only on study abstracts is the toxic-tort equivalent to writing a book report based only on a novel's back cover; what would not pass muster in middle school certainly does not satisfy *Daubert*.

Dr. Panigrahy's plagiarism also confirms that the "chemical" sections of his report do not reflect his own "judgment"—which, again, is a critical component of any epidemiological analysis. *See, e.g.*, REFERENCE MANUAL at 598 ("[E]pidemiology cannot prove causation; rather, causation is a judgment for epidemiologists . . . ."). His systematic deletion of lines or phrases that cut against causation reflects avoidance rather than analysis—precisely the sort of "conclusion-oriented selection process" against which District Courts must guard. *See In re Zoloft*, 858 F.3d at 796. Federal Rule of Evidence 702 requires the proponent of expert testimony to "demonstrate" the testimony's reliability, and Dr. Panigrahy's

plagiarized report simply failed to do so.[4]

### 3. Dr. Panigrahy failed to meet the intellectual standards to which he would be held in his own field.

Dr. Panigrahy's plagiarism additionally proves he did not prepare his report with "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *McClain*, 401 F.3d at 1237 (quoting *Kumho Tire*, 526 U.S. 137 at 152). He brandished Harvard Medical School's logo on the front page of his report and referenced his position as "an academic scientist" in the first clause of the report's first line. (Doc. 136-1 at 1–2.) Yet under the standards of his own institution, plagiarism and data falsification are forms of "research misconduct" and are "considered a serious violation of academic honesty." (Doc. 136-5 at 1–2.)

Dr. Panigrahy claimed that his failure to disclose when he was quoting from a *Monograph* was scientifically acceptable given the length of his report, his

---

[4] Appellants miss the mark in arguing that the District Court "faulted" Dr. Panigrahy for "not copying exactly enough." (Appellants' Br. at 38.) The District Court's point was that, by excising study results that tended to controvert causal associations, Dr. Panigrahy overstated the strength of the support for his proffered opinions. Likewise, if Appellants really believe that Dr. Panigrahy's plagiarism was no different than the District Court's reuse of sections from *its own* orders from this *same case*, they misperceive Dr. Panigrahy's misconduct. (*See id.* at 32–33.) Nobody could credibly contest that the language in the District Court's orders is its own and reflects the District Court's own judgment; reuse of its *own* prior work product is acceptable and, frankly, likely essential to managing its demanding caseload. In stark contrast, Dr. Panigrahy's plagiarism reflects a deliberate misappropriation (and mischaracterization) of the labor and judgment of other scientists in the context of a Bradford Hill analysis that places his *own* judgment squarely at issue.

references to the *Monographs* elsewhere (outside of the plagiarized portions of his report), and his citations to the primary sources. (*See, e.g.*, Doc. 136-3 at 192:25–193:15.) Appellants echo that refrain in their defense of plagiarism. (Appellants' Br. at 31 ("[B]ecause Dr. Panigrahy did cite his sources, the copying of language from those sources does not fit within the ordinary meaning of the term.").) But in the sections of his report at issue, Dr. Panigrahy did not cite "his" sources; he cited the sources that had been selected, compiled, and analyzed by IARC. Those sources ended up in Dr. Panigrahy's report only because he was essentially plagiarizing someone else's literature review (IARC's), which always pulls in the review author's primary sources; that is inherent in the nature of the plagiarized material, and it is no excuse for misappropriating the review author's work. *See Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, No. 6:15-cv-641-Orl-28TBS, 2017 WL 11457208, at *2 (M.D. Fla. Apr. 13, 2017) ("Due to [an expert's] attempt to appropriate the opinions of [another expert] and play them off as her own, [her] report is unreliable and must be excluded.").

#### 4. Dr. Panigrahy's efforts to obscure his plagiarism reflect deliberate attempts to disguise the methods he really used to develop his expert report.

Finally, Dr. Panigrahy's efforts to conceal his plagiarism add to the unreliability of his opinions. In addition to the textual misattributions of the analyses in his report—not just the lack of quotation marks, but the rephrasing of sentences

to omit mention of IARC's Working Group as their authors—Dr. Panigrahy had ample opportunity to come clean about his plagiarism during his deposition.  But he chose not to.  He stubbornly insisted that *he* selected the studies referenced in his report, that *he* performed the study-specific analyses, that *he* didn't just "track" IARC's analysis, and that the words in his report were *his own* and "unique to this case."  (*See* Doc. 66:25-67:3, 134:22-135:11.)  And even when he was confronted with proof of his plagiarism—side-by-side comparisons of his report to the plagiarized sources—he still refused to acknowledge what he'd done.  (Doc. 136-3 at 190:25–191:14.)  He treated the length of his report (more than "500 pages") and its volume of citations (more than "1,100") like safe harbors, as if they reflected a great deal of independent and exonerating analyses.  (*See id.*)  But his report was that lengthy and his citations that voluminous because of the great deal of work performed by IARC, not him.  So these attempts to mask his misconduct only emphasized it.

Appellants say this "appeal is not complicated" because Dr. Panigrahy's plagiarism presents only a "credibility issue."  (Appellants Br. at 15.)  But the deception Dr. Panigrahy exhibited in his report and deposition does not just undermine his credibility; it reflects a deliberate attempt to obscure the true methodologies he employed—plagiarism and falsification.  *See Spiral Direct*, 2017 WL 11457208, at *2 (excluding an expert's report following attempts to obfuscate

plagiarism, and noting that "the [c]ourt could have been led to believe that [the expert's] report was entirely her original work").

For these reasons, Dr. Panigrahy's plagiarism and subsequently attempted "cover up" squarely presented *Daubert* issues, and the court was correct to conclude that Appellants failed to demonstrate that Dr. Panigrahy's opinions met Rule 702's requirements for admissibility.

> **D.      The District Court had no obligation to independently review the more than 1,100 studies Dr. Panigrahy cited; the unreliability of his opinions was apparent from his report and testimony.**

This Court should summarily reject Appellants' alternative argument that "a proper *Daubert* analysis" required consideration of "all evidence in the record" and the District Court therefore abused its discretion by excluding Dr. Panigrahy without independently reviewing his cited studies.  (*See* Appellants' Br. at 18–21 (citation omitted).)

District courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Williams v. Mosaic Fertilizer, LLC*, 889 F.3d 1239, 1244–45 (11th Cir. 2018) (quoting *Kumho Tire*, 526 U.S. at 152).  "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Kumho Tire*, 526 U.S. at 142.  They therefore have no obligation to independently review an expert's cited scientific literature if the

experts' report, testimony, or other more accessible evidence makes clear that that the proponent of the testimony will not be able to establish its reliability. *See, e.g.*, *Kilpatrick*, 613 F.3d at 1340 (observing that an expert's testimony can be enough "by itself" to establish the unreliability under Rule 702).

And as addressed above, Dr. Panigrahy's initial general-causation report and corresponding deposition testimony offer the Court more than enough grounds for exclusion. Obligating the District Court to parse the more than 1,100 studies cited in Dr. Panigrahy's report—*a task that Dr. Panigrahy himself did not even attempt*—would therefore have been unnecessary, unworkable, and inconsistent with Appellants' burden of demonstrating reliability. *See* Fed. R. Evid. 702.

## II. Summary judgment was independently warranted for Lockheed Martin because Dr. Panigrahy's "no safe dose" general-causation opinions failed to establish a nonspeculative basis for inferring probable causation.

Alternatively, even if the District Court had erred in concluding that Dr. Panigrahy's "rampant plagiarism" rendered his general-causation opinions unreliable, the error would have been harmless for two reasons. First, Dr. Panigrahy's "no safe dose" general-causation opinions, made with no regard for any potentially case-relevant exposure conditions, failed to meet this Circuit's standards for establishing a "harmful level of exposure" and thus are inadmissible under Federal Rule of Evidence 702. Second, admissibility aside, Dr. Panigrahy's opinions failed to create a genuine issue of material fact on general causation because

they failed to establish a reasonable basis for inferring that exposures at or below the levels Appellants allegedly experienced (or, for that matter, any level) are capable of being the probable causes of their diseases.

### A. General-causation evidence must be tailored to potentially relevant exposure levels and must lay a groundwork for risk comparisons.

The crux of both issues is a dispute over what it means to prove "general causation" in this Circuit. Appellants argued that general-causation evidence need not be tailored to case-relevant exposure conditions (i.e., estimates of doses or ranges of doses a toxic-tort plaintiff expects to prove) and need not address the magnitude of purportedly increased disease risk (i.e., roughly *how much* the incidence of the disease would increase in a population subjected to similar exposure conditions). It is enough, in their view, to show *some* conditions exist (whatever they might be) that pose *some* risk of causing the plaintiff's disease (however low that risk might be), deferring more pointed dose-response inquiries to specific-causation analyses. But this is wrong. Case-relevant exposure conditions and corresponding magnitudes of risk are critical to general-causation evidence.[5]

---

[5] To clear the underbrush on strawman arguments Appellants made below, Lockheed Martin has never contended that tailoring general-causation evidence to case-relevant exposure conditions necessarily requires plaintiff-specific exposure data at the general causation stage. (Doc. 178 at 6–7.) It would be enough to stake out a level they plausibly expect to prove they experienced through exposure evidence to be introduced at the specific causation stage, then establish through population-level evidence that exposures at or below that level increase the incidence of the health condition at issue. That level does not even necessarily need

Appellants' overly abstract interpretation of general causation untethers the requirement from its conceptual moorings in proximate causation. To understand why, it helps to work backward from the causation standard toxic-tort plaintiffs must ultimately meet to survive a motion for directed verdict. While "[p]laintiffs in these actions must establish both general and specific causation," *DH BELO II*, 119 F.4th at 940, "these items are not 'elements' of a plaintiff's cause of action." Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. c(1) (2010). Rather, the same "proximate cause" element that would apply to any Florida tort claim applies to toxic-tort cases. *See Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1019 (Fla. 1984). Specifically, a toxic-tort plaintiff

> must introduce evidence which affords a *reasonable basis* for the conclusion that it is *more likely than not* that the conduct of the defendant was a substantial factor in bringing about the result. *A mere possibility of such causation is not enough*; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

---

to be a "threshold" dose in the sense that the plaintiffs do not necessarily need to identify some level *below* which the health condition *cannot* occur; the point is to reliably establish a "baseline" above which exposure materially increase the incidence of the health condition, *see Pinares v. Raytheon Techs. Corp.*, No. 19-14831, 2023 WL 2661521, at *5 (11th Cir. Mar. 28, 2023), even if exposures below that level still carry some lower degree of risk. Tailoring general-causation opinions to that level allows the focus of the general-causation stage to be on the reliability of any "research data demonstrating a relationship between exposure and the disease at the dose in question." REFERENCE MANUAL at 665.

*Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (emphasis added) (quoting *Gooding*, 445 So. 2d at 1018).

The general- and specific-causation requirements are thus components of proximate causation. They do not supplant or relax the proximate causation standard, but rather guide its application to the "special" problems that arise when a plaintiff tries to prove a "connection between a substance and development of a specific disease." Restatement § 28 cmt. c(1).

There are many such "special problems." *Id.* Diseases, for example, often have multiple causes, some of which are unknown (idiopathic). *Id.* And "[i]n most instances, cancers and other diseases do not wear labels documenting their causation." REFERENCE MANUAL at 665. There are no biological markers or other forms of direct causal evidence, so a tumor caused by an exposure will be biologically indistinguishable from a tumor that developed idiopathically. *See id.* Further, substances that are "known to cause diseases under certain exposure conditions will not do so under all exposure conditions," and the same conditions that cause disease in some people will not cause disease in others. *See id.* at 512.

For these reasons, proving causation in toxic-tort cases is necessarily an inferential exercise. But the proximate causation standard still applies. Toxic-tort plaintiffs must establish a reasonable basis for a non-speculative inference not only that their alleged exposures posed *some* risk of causing their diseases, but also that

the exposures "increased the risk of [disease] to a greater extent than the risk posed by all other potential causes." *See* Restatement § 28 cmt. b. In other words, proving proximate causation in a toxic-tort case boils down to enabling a comparison of risks. *See Guinn*, 602 F.3d at 1257 (addressing the importance of relative-risk).

The risk comparison at the heart of toxic-tort causation questions is why this Circuit, like many others, homes in on "levels" or "quantities" of exposure in both general- *and* specific-causation analyses. "'Scientific knowledge of the harmful level of exposure to a chemical' (general causation) 'plus knowledge that the plaintiff was exposed to such quantities' (specific causation) 'are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case.'" *DH BELO II*, 119 F.4th at 945. In this context, the "levels" or "quantities" are colloquialisms for "doses."

Dose is a critically important concept to establishing risks (i.e., probabilities of causation). "[T]he likelihood that a given disease or injury was induced because of exposure to one or more chemicals depends in large part on the size of that exposure"—which is to say the size of the dose. REFERENCE MANUAL at 512. Dose considerations are also important because "[m]ost 'low dose exposures—even for many years—will have no consequence[s] at all.'" *DH BELO II*, 119 F.4th at 941 (quoting *McClain*, 401 F.3d at 1242). These biological facts are why this Circuit has repeatedly characterized "dose" as "the single most important factor to consider in

evaluating whether an alleged exposure caused a specific adverse effect." *Id.* (quoting *McClain*, 401 F.3d at 1242).

**B.    Dr. Panigrahy offered "no safe dose" opinions that fail to establish a "harmful level of exposure" under this Circuit's precedents.**

Here, even while he was maintaining his "linear no-threshold" dose-response opinions (which, as addressed below, he later tacitly retracted), Dr. Panigrahy never disputed that cancer risks posed by the substances at issue in this case would be dose-driven. What Dr. Panigrahy said was that all of the substances at issue are capable of causing all of the cancers at issue at *any* dose—down to a "single molecule" (Doc. 136-3 at 114:15–115:1)—but the probability that an exposure would actually result in cancer would depend on the dose. (*Id.* at 98:23–99:7 ("[T]he higher the dose, the more higher the chance of getting cancer.").) Put differently, even if he were correct that the substances in this case can cause the cancers in this case (which he is not), and even if he were correct that there are technically no doses that pose "zero" risk (which is also wrong), Dr. Panigrahy acknowledged that the probability of causation would decrease with decreasing doses, all the way down to probabilities that are "infinitesimally small." (*Id.* at 113:12–18, 114:15–115:1.)

This, however, was as far as Dr. Panigrahy was willing to go in terms of articulating dose-response relationships. He never formed opinions on doses at which the substances in this case begin to pose even an "appreciable likelihood of causing one of the health outcomes"—let alone doses at which the types of cancers

at issue here would *probably* develop.  (*See id.* at 121:7–20.)  In fact, he admitted that the "linear no-threshold" framework on which he heavily relied is a form of extrapolation (risks posed at low, unobserved doses are estimated by extrapolating a dose-response curve from response levels that have been observed at higher doses in the real-world studies).  (*Id.* at 100:10–21.)  Yet he did not actually attempt to perform any extrapolations himself, nor did he use any other scientific methodology to try to model, graph, or otherwise characterize any dose-response relationship.  (*See id.* at 102:1–11.)  Consequently, he had no sense of how much (if at all) any change in any dose of any substance in his report would change the incidence of any cancer at issue in an exposed population.  (*See id.* at 102:17–102:24.)

In this same vein, Dr. Panigrahy made no attempt to tailor his epidemiological literature review to studies of populations that had been subjected to exposure conditions Appellants might plausibly have experienced.  (*Id.* at 88:1–11.)  In fact, he specifically grounded his opinions in IARC's cited studies of high-exposure occupational settings (i.e., workers exposed at their workplace due to industrial operations) even though he *knew* that Appellants were not claiming occupational exposures.  (*Id.* at 82:9–19 ("Q.  Okay.  So you understand that *the plaintiffs in [this case] are not claiming occupational exposures*, right?  A.  *Correct*." (emphasis added)); *see also id.* at 83:7–21, 85:20–24 (similar).)

Dr. Panigrahy did not dispute the dose-response limitations of his opinions. He repeatedly made clear that he was not restricting his general-causation opinions to any specific exposure levels or otherwise tailoring his opinions to levels Appellants might plausibly have experienced. (*See* Doc. 136-3 at 90:3-90:9, 128:23–129:5.) He had approached the general-causation opinions this abstractly for two reasons.

First, Appellants' counsel did not ask Dr. Panigrahy to account for plausible exposure levels. They provided him no assumptions to make about relevant exposure conditions and no framework for evaluating potential exposure conditions himself. (*Id.* at 96:19–97:4.) This might have been because Appellants' counsel proceeded through the entire general-causation phase of the litigation without ever sampling or modeling exposure conditions at the site of the alleged exposure—so counsel themselves had no meaningful sense of potentially relevant doses. (*See* Doc. 180.) This wholesale failure to develop even preliminary exposure evidence left Dr. Panigrahy with no dose estimates to compare against doses addressed in scientific literature. (Doc. 136-3 at 87:17–25, 89:2–8.)

Second, Dr. Panigrahy himself chose not to tailor his general-causation opinions to exposure levels Appellants hoped to prove because he patterned his report after (and, of course, plagiarized most of its contents from) IARC's Monographs. He understood a toxic-tort general-causation analysis to be the same

as the type of inquiry performed by IARC's Monograph Working Groups. But again, IARC's Monograph scientists work toward an objective that differs dramatically from proving probable causation in a toxic-tort case. As a regulatory advisory body seeking to inform "decisions concerning preventative measures" (Doc. 136-7 at 9), IARC's "*Monographs* are an exercise in evaluating cancer *hazards*," not cancer "*risks*" (*id.* at 8 (emphasis added)). "A cancer 'hazard' is an agent that is capable of causing cancer under *some* circumstances, while a cancer 'risk' is an estimate of the carcinogenic effects expected from an exposure to a cancer hazard." (*Id.* (emphasis added).)

The proximate causation standard applicable to toxic-tort cases means that "hazards" are not what matter in the courtroom; the law requires "risk"—indeed, enough risk to support an inference of probable causation. *Monographs* are not intended to meet this requirement, and IARC expressly cautions against reading them as risk assessments. (*Id.* ("The distinction between hazard and risk is important, and the *Monographs* identify cancer hazards even when risks are very low at current exposure levels, because new uses or unforeseen exposures could engender risks that are significantly higher.").) Further, because IARC investigates whether substances can cause cancer under *any* conditions, *all* potential exposure conditions are relevant to its scientists. (*See id.*) This is markedly different from the level-specific general-causation questions that must be answered in toxic-tort cases.

### C. Dr. Panigrahy's failure to tailor his opinions to potentially relevant exposure levels precluded Appellants from establishing a genuine issue of material fact on general causation.

Lockheed Martin presented Dr. Panigrahy's dose-response failures to the District Court in several ways. It moved to exclude Dr. Panigrahy's opinions as unreliable, arguing that they amounted to "no safe dose" theories that fail as a matter of law to establish "harmful levels" of exposure in accordance with *McClain*,[6] its progeny in this Circuit,[7] and the many persuasive district court orders[8] that have

---

[6] *Compare* Doc. 136-3 at 91:18–25 ("[Q.] If I were to ask for each of the substances you address in your expert report *how much is too much*, would your answer every time be *any amount*? A. *Yes*. Because these are genotoxic, mutagenic carcinogens, any exposure would be bad and could cause cancer." (emphasis added)), *with McClain*, 401 F.3d at 1241 (reversing for failure to exclude an expert who "*could not say how much is too much*" and insisted that "*any level is too much*" had "laid no reliable groundwork for determining the dose-response relationship" (emphasis added)); *see also Pinares*, 2023 WL 2661521, at *4 (applying *McClain* and affirming exclusion of no-safe-dose opinions).

[7] *See, e.g.*, *DH BELO II*, 119 F.4th at 943 (affirming exclusion of general causation experts who failed to "identify" and substantiate harmful levels of exposure); *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1307 (11th Cir. 2014) (affirming exclusion of general-causation experts who failed to "determine how much" of an alleged toxic agent "must be used for how long to increase the risk of" the disease).

[8] Doc. 136-3 at 122:11–19 ("Q. Okay. Is it fair to say that *the most you're willing to say* about the level of risk that accompanies a low-dose exposure to any of the substances in your report *is that the risk is not zero*? [A.] Correct, correct. . . ." (emphasis added)), *with In re Zantac (Ranitidine) Products Liab. Litig.*, 644 F. Supp. 3d 1075, 1109, 1273–76 (*excluding a "no-threshold" opinion* **by Dr. Panigrahy** and reasoning: "[T]he Plaintiffs minimize the importance of the concept of the amount of any potential risk from ranitidine consumption. *The question of general causation is not satisfied simply because an infinitesimal risk of cancer is more than zero risk*." (emphasis added)); *see also, e.g.*, *In re Deepwater Horizon Belo Cases*, No. 3:19-

correctly applied this precedent. (Doc. 139 at 10–12.) Lockheed Martin also argued that Dr. Panigrahy's refusal to appropriately tailor his opinions ensured that his opinions would never "fit" the facts of the case. (*Id.* at 3–9 (citing, e.g., *In re Deepwater Horizon BELO Cases*, No. 20-14544, 2022 WL 104243, at *3 (11th Cir. Jan. 11, 2022) ("*DH BELO I*") ("A general causation opinion that [a substance] can be harmful at some level that the Plaintiffs were not potentially exposed to . . . is simply not helpful to the trier of fact . . . .")); *see also DH BELO II*, 119 F.4th at 943 (reiterating that *DH BELO I* was "well-reasoned"). And Lockheed Martin separately moved for summary judgment, arguing that even if Dr. Panigrahy's opinions were admissible, his testimony failed to lay a groundwork for performing later risk-to-risk comparisons that would be essential at the specific-causation stage and thus failed to create a genuine issue of material fact on general causation. (Doc. 152 at 11–21 (citing, e.g., *Guinn*, 602 F.3d at 1256).)

Unable to deny the factual limitations of Dr. Panigrahy's testimony, Appellants responded largely with legal arguments for delaying all consideration of case-relevant exposure conditions until the specific-causation stage of the case.

cv-963-MCR-HTC, 2022 WL 17721595, at *15 (N.D. Fla. Dec. 15, 2022) ("An opinion that any amount is harmful is simply contrary to the law of this Circuit.").

**1. Appellants improperly persuaded the District Court to defer consideration of dose-response issues based on a misreading of *McClain* that this Circuit recently rejected.**

Appellants' principal argument was textual, grounded in a misreading of *McClain*. There are two passages in *McClain* that described the question of whether the plaintiff was " exposed to *enough* of the toxin to cause the alleged injury" as a question of "of *individual* causation." *See* 401 F.3d at 1239 (emphasis added); *see also id.* at 1242 (same). Appellants misinterpreted these passages to mean that the question of "how much" exposure is "enough" to cause a particular disease is exclusively a specific-causation question. (*See* Doc. 177 at 4 (arguing that "the question of 'too much' must be addressed at the plaintiff-specific causation stage" (citing *McClain*, 401 F.3d at 1239); *see also id.* at 3 ("As *McClain* expressly notes, the dose-response relationship is an aspect of specific, not general, causation." (quoting *Williams v. Int'l Paper Co.*, No. CV 108-45, 2009 WL 10678630, at *1 (S.D. Ga. July 19, 2009))).)[9]

But the point of these passages from *McClain* was not that "how much is too much" goes to specific causation. It does not. This Court made that clear in *McClain*

---

[9] The mis-reasoned *Williams v. Int'l Paper Co.* is nonprecedential and should not be confused with *Williams v. Mosaic Fertilizer LLC*, in which the district court appropriately treated a plaintiff's expert's failure to establish a dose capable of causing the relevant disease as a general causation failure—specifically, a failure to establish a "general causation dose." *Williams v. Mosaic Fertilizer, LLC*, No. 8:14-CV-1748-T-35MAP, 2016 WL 7175657, at *9 (M.D. Fla. June 24, 2016). This Court affirmed. *Williams*, 889 F.3d at 1239.

itself, *see* 401 F.3d at 1241, 1252 (holding that it was "error to admit [an expert's] testimony to establish *general causation*" when he "could not say how much is too much" (emphasis added)), then again in *Chapman*, 766 F.3d at 1307 (characterizing an inability to determine "how much Fixodent must be used for how long to increase the risk of a copper-deficiency" as a "general-causation" failure). The point the Court was driving at in *McClain* was instead that because there are typically "some dose below which even repeated, long-term exposure would not cause an effect in any individual," proof of exposure without consideration of dose is not enough for a plaintiff to prevail in a toxic-tort case. *See* 401 F.3d at 1242. The plaintiff must go further and establish that the "levels," "quantities," or "doses" to which he was exposed "*can* cause the harm" alleged, which requires proof that the same "levels," "quantities," or "doses" would "increase[] the incidence of disease in a group." *See id.* at 1239 ("This is called general causation."). In other words, the lines Appellants misinterpreted in *McClain* spoke to the importance of laying a general-causation dose-response predicate that can be paired with specific-causation exposure evidence to enable a nonspeculative inference that the exposure *probably* caused the disease.

Unfortunately, the District Court was persuaded by Appellants' misinterpretation of *McClain*. Based on the same textual analysis of the same quoted

provisions, it concluded that considerations of "'case-relevant exposure conditions' are part of the specific causation inquiry." (Doc. 370 at 16–18 & nn. 9–10.)

At the time of its decision, however, the District Court did not have the benefit of *DH BELO II*, a recent opinion in which this Circuit rejected the *exact* argument Appellants advanced below—that "'[h]ow much of an agent is sufficient to cause harm' goes to 'whether the substance caused the plaintiff's *specific* injury.'" 119 F.4th at 946. "[T]his argument," this Circuit explained, "confuses the issue." *Id.* "A plaintiff's exposure to the threshold dose of a toxin is relevant to specific causation. Yet we also ask, *under our general-causation framework*, whether a harmful level of the toxin exists in the first place." *Id.* (emphasis added). The doses that must be proven at the specific-causation stage are thus analytically linked to (and indeed, must exceed) harmful doses that must be established through general-causation evidence. *See id.*[10]

---

[10] Deferring the question of 'how much' to the specific causation stage would also create an inefficient and unnecessary analytical "loop the loop," forcing general-causation methodologies to be applied twice: once at the general causation stage (where a causal association at any level would suffice), then again at the specific causation stage (where a causal association at the plaintiff's exposure levels would need to be established in the first instance). (Doc. 266 at 7–8 (making this argument below).)

## 2. Appellants also erroneously convinced the District Court that epidemiology-based general-causation opinions need not establish "harmful levels" of exposure.

As an alternative basis for excusing Dr. Panigrahy's dose-response failures, Appellants argued, and the District Court agreed, that general causation can be established through epidemiological studies without regard to whether doses experienced by the study subjects are comparable to doses the plaintiffs could plausibly have experienced. This too is wrong.

The District Court's confusion appears largely attributable to this Court's tendency to characterize "dose-response, epidemiological evidence, and background risk of disease" as distinct "methodologies." *See, e.g., Chapman*, 766 F.3d at 1308. The logic seems to have been that if "dose-response" considerations are methodologically distinct from "epidemiological" considerations, then general causation must be epidemiologically provable without linking the study subjects' doses to the facts of the case.

But while epidemiology is a standalone scientific discipline, "dose-response" is not. It is not even exclusively associated with toxicology. Courts often describe the dose-response relationship as a core toxicological tenet, *e.g.*, *DH BELO II*, 119 F.4th at 941 ("This relationship is 'the hallmark of basic toxicology' because 'all substances potentially can be toxic.'" (quoting *Chapman*, 766 F.3d at 1307)), but its relevance extends to other disciplines—including epidemiology.

"Dose issues are at the interface between toxicology and epidemiology." REFERENCE MANUAL at 658. Both disciplines, at bottom, investigate whether a dose of a specific substance yields a specific disease response in study subjects. *Id.* at 505 ("[E]pidemiological and toxicological studies provide information on how the seriousness and rate of occurrence of the hazard in a population (its risk) change as exposure to a particular chemical changes.").

The differences between the two disciplines relate mainly to *how* the scientists investigate dose-response relationships—experimentally versus observationally. Toxicological studies typically occur in experimental settings where investigators actively participate, carefully controlling for confounders and determining doses to be administered to study subjects. *See* REFERENCE MANUAL at 555. These conditions lend themselves to more precise dose-response characterizations than those inferred from observational studies. *See id.* However, experimental studies of potentially harmful substances can only be conducted on animals (in vivo research) or cells (in vitro research), and "uncertainties regarding extrapolation from animal and in vitro data to humans" limit the value of dose-response relationships measured in these settings. *Id.* at 658.

In contrast, epidemiological studies are observational in nature. Investigators "typically 'observe' a group of individuals who have been exposed to an agent of interest, such as cigarette smoke or an industrial chemical and compare them with

another group of individuals who have not been exposed." *Id.* at 555. The main advantage of epidemiological studies is that their subjects are human beings, so they do not present the same extrapolation problems as in vivo or in vitro research. *See id.* But the uncontrolled environments and retrospective nature of some study designs make it difficult to control for confounders and, more important here, more challenging to characterize dose-response relationships precisely. Doses sometimes must be estimated after the fact by industrial hygienists or other exposure scientists, and some study designs leave exposure conditions entirely unquantified (relying instead on questionnaires in which study subjects self-report the *fact* of exposure, or on assumptions about exposure based on job titles). *See id.* at 585–90 (discussing these issues and the resulting "information bias").

That said, the dose-response measurement challenges that commonly arise in epidemiological studies do not authorize toxic-tort plaintiffs and their general-causation experts to ignore the dose-response relationship. This core toxicological tenet does not cease to exist simply because its contours can be difficult to observe through the lens of epidemiology. This Circuit has always required causation experts who rely on "epidemiological studies" to "explain[] how the findings of those studies may be reliably connected to the facts of the particular case." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1196 (11th Cir. 2010).

A toxic-tort expert seeking to establish general-causation through an epidemiological study must therefore explain how the doses experienced by the study subject can be reliably linked to doses relevant to plaintiff's claims. *See, e.g.*, *In re Deepwater Horizon Belo Cases*, 2020 WL 6689212, at *13 (finding expert epidemiological analyses unreliable for failure to establish "that the conditions present in these cases were somehow comparable to the conditions present in these studies"); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 353 (5th Cir. 2007) (affirming exclusion of epidemiology-based general-causation opinions grounded in studies of "different occupations," differing "length of exposure," and other distinctions undercutting the expert's conclusion that the "chemicals [the plaintiff] allege[d] caused his injury would cause the same particular injury in the general population *in similar circumstances*" (emphasis added)). This includes providing a reliable basis for inferring whether and to what extent cancer risks identified in studies of high-dose exposures would persist in any lower-dose environments relevant to the plaintiff's claims, even if multiple experts are required to "bridge this gap." *DH BELO I*, 2022 WL 104243, at *3.[11]

---

[11] The District Court also seems to have viewed the fact that 'the *existence* of a dose-response relationship is part of the Bradford Hill analysis" to mean that epidemiological general-causation analyses consider only whether a dose-response relationship exists at any level. (*See* Doc. 370 at 14.) But this line of reasoning overlooks that the Hill criteria are applied "only *after* a study finds an association." REFERENCE MANUAL at 598. The proper analytical sequence should *begin* with identifying an association at a potentially case-relevant dose, then turn to a Hill

### 3. A correct interpretation of *McClain* and this Circuit's "indispensable methodologies" compels summary judgment for Lockheed Martin based on Dr. Panigrahy's failure to establish harmful exposure levels.

The District Court accordingly misapplied this Circuit's precedent on "indispensable" methodologies when it concluded that epidemiological analyses could be applied without any dose-response considerations. (*See* Doc. 370 at 19.) This mistake, coupled with its misreading of *McClain* to the effect that case-relevant exposure conditions matter only to specific causation,[12] led the District Court to conclude that it could not "throw out Plaintiffs' whole case at the general causation stage . . . simply because Plaintiffs' general causation experts were not yet asked to focus on the doses to which Plaintiffs were exposed." (*Id.*)

The net effect of these decisions was to absolve Dr. Panigrahy of his failure to establish "*McClain's* first 'minimal fact'"—the "general causation" minimal fact—which is "[s]cientific knowledge of the harmful level of exposure to a chemical." *DH BELO II*, 119 F.4th at 946. In other words, Dr. Panigrahy never identified doses to be proved at the specific-causation stage, offered disease-specific

---

analysis that includes consideration of whether the study that found the association also identified a dose-response *gradient*, which would reduce the likelihood that the association resulted from confounding. *See id.* at 603.

[12] The District Court's legal interpretations are reviewable de novo. *See Witt v. Stryker Corp. of Michigan*, 648 F. App'x 867, 872 (11th Cir. 2016) ("[W]hen the district court misinterprets . . . controlling case law, our review is plenary." (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 556 (11th Cir. 1998)).

opinions on the risks those doses posed, or justified his opinions with references to specific studies or other scientific data demonstrating comparable responses in comparably exposed populations.

Allowing Appellants' case to proceed without establishing this "minimal fact" was error. Fortunately, the error turned out to be harmless in light of the District Court's later plagiarism-based exclusion of Dr. Panigrahy's opinions. But there were at least two independent bases for granting Lockheed Martin summary judgment.

> **D.    The Bellwether Group I specific-causation proceedings—including Appellants' disclosure of modeled exposure levels that were millions of times lower than any levels identified in Dr. Panigrahy's epidemiology—go to show why general-causation opinions cannot ignore potentially relevant exposure conditions.**

The way the Bellwether Group I specific-causation stage unfolded is emblematic of why it is critical to stake out and substantiate potentially harmful doses *at the general-causation* stage of the causal inquiry.

When Appellants finally disclosed their exposure evidence, it came in the form of testimony from an expert named Dr. Sahu. Dr. Sahu claimed to have used a computer program to model Lockheed Martin's contribution to PCE, TCE, styrene, hexavalent chromium, and arsenic concentrations in the air outside of the Golf Channel building where Plaintiffs worked. He summarized the results of his model in a table in his expert report listing modeled annual average concentrations of these substances at issue over a 25-year period. The table omitted the unit of

measurement, but it is undisputed that the concentrations were expressed in micrograms per cubic meter ($\mu g/m^3$).  Predictably, Dr. Sahu's modeled exposure concentrations were *dramatically* lower than the concentrations listed in the epidemiological studies he referenced—between **1,100 and 95 million times lower**.

For example, Dr. Panigrahy cited a study called Loomis 2019 for the proposition that styrene inhalation can cause lymphoma.  Loomis 2019 studied workers in the reinforced plastics industry, where the "mean concentration of styrene during employment . . . was approximately 63 ppm."  (Doc. 270-30 at 3.)  That translates to an average styrene exposure level of 268,380 $\mu g/m^3$, which is roughly *63 million times higher* than Dr. Sahu's highest modeled styrene concentration (0.00425 $\mu g/m^3$).  (Doc. 266 at 11 (explaining calculation); Doc. 275-32 (same).)  For a sense of scale, a ratio of one to 63 million is roughly the same as the difference between *one inch* and *1,000 miles*.  (Doc. 266 at 11.)

This example is not an outlier.  While most of the epidemiological studies Dr. Panigrahy cited did not provide exposure quantifications (even indirectly), all the studies that Lockheed Martin found to even remotely quantify the subjects' inhaled concentrations involved concentrations that were orders of magnitude higher than those modeled by Dr. Sahu.  (*See* Doc. 310 at 16–17 (tabulating ratios of concentrations reported in studies to the concentrations modeled by Dr. Sahu, with citations to the studies and ratio calculations).)

Lockheed Martin's counsel attempted again at Dr. Panigrahy's specific-causation deposition to elicit an explanation of how his cited epidemiology purportedly established dose-response relationships at the much lower exposure levels Appellants allegedly experienced. Tellingly, however, even by that late stage of the case, Dr. Panigrahy had not attempted to compare Dr. Sahu's modeled concentrations to any dose expressed in his general-causation reports (Doc. 280–1 at 252:23–253:6) or any concentration expressed in any epidemiological or toxicological study (*id.* at 96:16–96:24). In fact, he admittedly *did not know how to read* Dr. Sahu's modeled exposure concentrations and had never even "tried to figure out the units of measurement." (*Id.* at 70:11–70:24.)

Ironically, his attempted excuse for not comparing Dr. Sahu's modeling results to any scientific literature was that the exposure conditions in the studies were *so different* from those at issue in this case that it would have been impossible to draw valid comparisons. (*Id.* at 72:4–25.) But the fact that differences in exposure conditions can affect the validity of extending a study's findings to the facts of a case is precisely why exposure conditions must be analyzed, not ignored.

Yet ignore them he did. According to Dr. Panigrahy, all he really needed to know to rule in Lockheed Martin's emissions as a possible cause of Appellants' cancers was that Dr. Sahu's modeled exposure concentrations were much higher than

"background" concentrations of the substances at issue. But this line of reasoning is replete with analytical gaps.

For one thing, it assumes that any level of exposure above Dr. Sahu's computer-generated "background" concentrations is capable of causing any of the Appellants' myriad forms of cancer. His main support for this untested hypothesis was the "linear no threshold" dose-response theory he had advanced at the general-causation stage—that even a single molecule of the substances at issue could damage DNA, and "as soon as you induce DNA damage, it's like a domino effect." (Doc. 136-3 at 110:14–25.) But when Lockheed Martin's experts pointed out that this "no safe dose" theory ignores the human body's DNA-repair mechanisms, he tried to respond that DNA-repair mechanisms only make exposures "below background" biologically irrelevant. (*See* Doc. 275-7 at 18.) This, of course, amounted to a tacit concession that even genotoxic substances have practical thresholds for disease causation; there is no such thing as a "no-threshold" toxin for toxic-tort purposes. *See Pinares*, 2023 WL 2661521, at *4 (affirming exclusion of "one-hit theory" of cancer causation). And tellingly, Dr. Panigrahy self-servingly defined the term "background," for purposes of his opinions, as *all* ambient concentrations of PCE, TCE, styrene, hexavalent chromium, and arsenic other than those that allegedly originated from Lockheed Martin's facility. (Doc. 280-1 at 175:19–176:4.) But again, he offered no support for this theory other than his own

ipse dixit because he had never even tried to identify epidemiological or other scientific literature establishing dose-response relationships at or below Dr. Sahu's modeled exposure or background concentrations.

Dr. Panigrahy's refusal to compare Dr. Sahu's modeled concentrations to any scientific literature also left him with no basis for assessing the *amount* of risk that would accompany Dr. Sahu's modeled concentrations even if it were true that those concentrations posed *some* cancer risk. Dose-specific risk assessments are derived from comparing response rates across study subjects who have been exposed to comparable doses. *See, e.g.*, REFERENCE MANUAL at 665 (explaining that this process involves deductive reasoning from "research data demonstrating a relationship between exposure and the disease at the dose in question").

Dr. Panigrahy tried to deflect from his inattention to dose-specific risk amounts by claiming he had eliminated all other possible causes of the Bellwether Group I Appellants' cancers through differential etiology analyses. But setting aside whether he reliably excluded *known* alternative causes of cancers, he concededly did not even try to eliminate *idiopathic* causes. He simply said that they are "not really relevant" in the face of a "known risk factor," a term he interpreted here as encompassing Lockheed Martin's emission. (*See* Doc. 280–1 at 37:25–138:9, 150:22–151:10.)

48

But this argument is logically fallacious and precedentially foreclosed. Dr. Panigrahy conceded that all of the cancers at issue in Bellwether Group I can develop in people with "no known risk factors." (Doc. 280-1 at 138:12–18.) What this means is that we *know* that causes of these cancers exist but have not yet been identified. So it does not follow that the presence of a known risk factor indicates the absence of a not-yet-identified but undeniably existing idiopathic cause.

Because these idiopathic causes typically cannot be excluded outright in differential etiology analyses, the way to account for them is through risk *comparisons*. A toxic-tort plaintiff can prove probable causation by establishing that the magnitude of the cancer risk accompanying the plaintiff's dose of the substance at issue exceeds the magnitude of the risks from all other possible sources, including idiopathic and other background risks. Restatement § 28 cmt. c(4). A valid differential etiology sometimes aids in this comparison by excluding fractions of a plaintiff's background risk that are attributable to known but inapplicable causes. *See id.*

But enabling the relative-risk comparison on which this analysis turns requires a reliable estimate of the magnitude of the risk that accompanies a relevant dose of the substance at issue. *See Guinn*, 602 F.3d at 1256 (affirming exclusion of an expert who "made no attempt to quantify the relative contribution of [the plaintiff's] risk factors"). And what a plaintiff cannot do, as this Court has made repeatedly clear, is

simply disregard idiopathic causes of a disease. *See Chapman*, 766 F.3d at 1311 (omitting "consideration of idiopathic causes" reflects a "lack of methodological rigor" (cleaned up)); *Kilpatrick*, 613 F.3d at 1342 ("The failure to take into account the potential for idiopathically occurring [disease] . . . placed the reliability of [the expert's] conclusions in further doubt."); *McClain*, 401 F.3d at 1243-44 (general-causation opinions should account for "how much additional risk" the exposure causes over all "known or unknown" background causes of the disease).

Because Dr. Panigrahy improperly ignored idiopathic causes of the cancers at issue, the reasoning behind his differential etiology analyses amounted to a kind of Holmesian fallacy: He believed he could isolate Lockheed Martin's emissions as the probable cause of Appellants' cancers without considering dose-specific risk magnitudes because he believed he could rule out the other possible causes. More colloquially, if you eliminate the impossible, what remains, however improbable, must be the cause. But Dr. Panigrahy could never have ruled out idiopathic causes, which makes the logic of his differential etiology analyses break down.

Dr. Panigrahy's specific-causation opinions thus reduced to unscientific speculation. This was the inevitable result of his refusal to stake out any "harmful level[s] of exposure" in his general-causation opinions, which consequently left "no reliable groundwork for determining the dose-response relationship[s]" and

corresponding probabilities of harm that are essential to nonspeculative specific-causation evidence.  *See McClain*, 401 F.3d at 1241.

So even if Dr. Panigrahy's opinions had not been plagiarized from IARC source material, Lockheed Martin would still have been entitled to summary judgment.  His unscientific and speculative "no safe dose" opinions lacked "requisite scientific reliability *Daubert* demands," and there was "no basis for the court below to conclude" otherwise.  *See McClain*, 401 F.3d at 1255.  Admitting his opinions would therefore have been a reversible abuse of discretion and abdication of the District Court's "gatekeeper responsibilities."  *See id.* (reversing admission of comparably unreliable testimony).  Appellants consequently had no admissible expert testimony on general causation, requiring summary judgment for Lockheed Martin.  *See id.* at 1237 (holding that proof of causation in toxic tort cases "requires expert testimony").  And even if Dr. Panigrahy's testimony were admissible, it would be too speculative to enable specific-causation testimony that could meet Florida's probable causation standard.  *See Guinn*, 602 F.3d at 1256 ("speculative" expert causation testimony does not suffice to create a genuine issue of material fact); *see also McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 869 F.3d 246, 273 (3d Cir. 2017) (explaining how "any exposure" causation opinions fail to create a genuine issue of material fact because a jury could not base a plaintiff's verdict on them without "engaging in rank speculation").

Appellants might argue that Florida's probable-causation standard sets too high a bar in complex toxic-tort cases, and that it should be enough to show exposure to a substance at levels that pose *some* risk. But the complexity of their claims is no justification for speculation, and relaxing longstanding tort standards is not the prerogative of the courts. *Cf. Gooding*, 445 So. 2d at 1019 ("Relaxing the causation requirement might correct a perceived unfairness to some plaintiffs who could prove the possibility that the medical malpractice caused an injury but could not prove the probability of causation, but at the same time could create an injustice."); *see also Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir. 1996) (reasoning that while a "legislature might well altogether outlaw a substance on the ground that it is known to involve a risk of appreciable harm to human beings, without having precise data on the question of how much harm," it is "not enough" under tort principles "for a plaintiff to show that a certain chemical agent *sometimes* causes the kind of harm that he or she is complaining of"; "there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains before there can be a recovery.").

As the same animating principles apply here, this Court should reach the same conclusion, affirming summary judgment for Lockheed Martin and rejecting any arguments for relaxation of the governing probable cause standard.

**III.  Drs. Kendall and Cowan could not have and did not purport to have established general causation.**

Lastly, Drs. Kendall and Cowan make no difference to the outcome of this appeal.  There was no reason for the District Court to have addressed their testimony before granting summary judgment.

In short, Dr. Kendall was a toxicologist who, in a cursory report, claimed to "share [the] opinions" of Dr. Panigrahy and other experts, professing in a footnote to have "conducted [his] own independent review of the science and arrived at the same conclusions" as him.  (Doc. 150-1 at 5 & n.2.)  But Dr. Kendall failed to substantiate those assertions, offering no meaningful explanation of the bases and reasons for his analyses.  (*See id.*)  In the context of excluding the testimony of another general-causation expert, Dr. Kantor, the District Court rightly concluded that Dr. Kendall's opinions were no more than inadmissible ipse dixit.  (*See* Doc. 383 at 14 (citing, e.g., *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) ("Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough.")).)  The same analysis applies here.

And despite Appellants' *counsel's* arguments on appeal, neither Dr. Kendall nor Dr. Cowan (a statistician retained by Appellants) performed or even claimed to have performed "background risk" analyses.  A background-risk analysis is a comparison of (a) the rate of disease in a population with a known exposure to the

substance in question and (b) the "[r]ate of disease in a population that has no known exposures." REFERENCE MANUAL at 620. It is a type of population-based observational epidemiology. (*See id.*)

All Dr. Cowan did was compare various disease-specific mortality rates in the ZIP code encompassing SLRC with mortality rates in other ZIP codes. He did *not* claim that this comparison satisfied the study-design requirements necessary for a reliable epidemiological analysis. To the contrary, he disavowed offering epidemiological opinions (Doc. 298-1 at 33:21–34:5), toxicological opinions (*id.*), or other "causation" opinions (Doc. 298-2 ¶ 36). What's more, he testified that he did not know *anything* about exposures in the ZIP codes he studied. (Doc. 298-1 at 69:13–16.) It would thus have been impossible for him to perform the type of exposure-based comparison vital to a background-risk analysis.

Dr. Kendall claimed to have reviewed Dr. Cowan's statistical analysis and found there to be "toxicological plausibility" that the allegedly elevated mortality rates in SLRC's ZIP code were attributable to Lockheed Martin's operations. (Doc. 150-1 at 9.) But aside from this being unsubstantiated ipse dixit, it too is not a background risk analysis. Dr. Kendall admitted that he had not performed any epidemiological studies (Doc. 150-3 at 48:6–49:2) and was not offering an opinion on fate-and-transport (i.e., exposure) (Doc. 150-4 at 259:23–25). Nor could he have

considered exposure because, at the time of his report's disclosure, Dr. Sahu's model was "still a work in progress." (*See* Doc. 152-1 at 92:4–93:1.)

The notion that Dr. Kendall or Dr. Cowan could have offered anything material to the general-causation inquiry is thus demonstrably false, and the District Court committed no abuse of discretion in resolving the claims on appeal without directly addressing these experts' opinions.

## CONCLUSION

Lockheed Martin respectfully requests that the judgment below be affirmed.

Dated: April 14, 2025

Brigid F. Cech Samole
GREENBERG TRAURIG, P.A.
333 S.E. Second Avenue, Suite 4400
Miami, Florida 33131
Telephone: 305.579.0500
Brigid.CechSamole@gtlaw.com
miamiappellateservice@gtlaw.com

Respectfully submitted,

David B. Weinstein
Ryan T. Hopper
GREENBERG TRAURIG, P.A.
101 East Kennedy Boulevard
Suite 1900
Tampa, Florida 33602
Telephone: 813.318.5700
weinsteind@gtlaw.com
hopperr@gtlaw.com

By: ____/s/ David B. Weinstein____
        David B. Weinstein

*Counsel for Defendant-Appellee Lockheed Martin Corporation*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the length limit of Fed. R. App. P. Rule 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 12,951 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 2010 in Times New Roman, 14-point font.

*/s/ David Weinstein*
David B. Weinstein

## CERTIFICATE OF SERVICE

I certify that on April 14, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ David Weinstein*
David B. Weinstein